Laurel Allen CHAN et al., Plaintiffs,

v.

Griffin B. BELL, Defendant.

Civ. A. No. 78–0550.

United States District Court,
District of Columbia,
Civil Division.

Dec. 19, 1978.

William J. Chen, Jr., Bethesda, Md., for plaintiffs.

Lauren S. Kahn, U. S. Dept. of Justice, Washington, D. C., for defendant.

## OPINION

HAROLD H. GREENE, District Judge.

This is an action for judicial review of a decision of the Immigration and Naturalization Service denying to plaintiff Ah Kow Chan classification as an "immediate relative" of plaintiff Laurel Allen Chan with the consequence that he will not receive an immigrant visa. The case is presently before the Court on cross motions for summary judgment.

### I

The facts in the record[1] show that Mr. Chan, an alien and a native of Malaysia, and Mrs. Chan, a natural born American citizen, entered into a valid ceremonial marriage on January 10, 1975, in the State of Tennessee. The two plaintiffs had known

---

1. Although plaintiffs have sought to bring in the recent affidavit of Mrs. Chan, that document was not a part of the administrative record and will therefore not be considered by this Court *ab initio.* See *Camp v. Pitts,* 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); *Doraiswamy v. Secretary of Labor,* 180 U.S.App. D.C. 360, 555 F.2d 832 (1976).

each other for several years[2] as students at Wesleyan College in Athens, Tennessee, and had engaged in a lengthy courtship. Their marriage was consummated, they lived together as husband and wife, and they jointly purchased realty and other property. On February 10, 1975, Mrs. Chan filed with the Service a petition to classify her husband as her "immediate relative" pursuant to section 201(b) of the Immigration and Nationality Act, 8 U.S.C. § 1151(b). Thereafter, on July 4, 1975, plaintiffs effected a voluntary separation. While they have lived apart since that time, they have continued to maintain an amicable relationship and to own jointly certain real estate and other property.

On June 14, 1976, the district director of the Immigration and Naturalization Service in Baltimore denied Mrs. Chan's petition to classify her husband as an "immediate relative." His sole basis for that action was a letter she had sent to the Service[3] that May stating that due to marital difficulties, she and her husband had ceased living together and expected to institutionalize their separation.[4] Plaintiffs' immediate appeal to the Board of Immigration Appeals was dismissed some sixteen months later. This action followed. It requests a declaratory judgment and an order requiring defendant to grant to plaintiff Ah Kow Chan "immediate relative" status and to enjoin his deportation or exclusion from the United States.

## II

■ 8 U.S.C. § 1151(b) provides that "immediate relatives" of United States citizens, defined to include spouses, who are otherwise qualified for admission as immigrants shall be admitted as such, without regard to other, ordinary numerical limitations. Once a petition for immediate relative status is filed, it must be approved as long as the Attorney General determines "that the facts stated in the petition are true and that the alien in behalf of whom the petition is made is an immediate relative specified in section 1151(b) of this title." 8 U.S.C. § 1154(b). Thus, the role of the Attorney General is limited: he is required to approve any true petition of a spouse of an American citizen in order that such spouse may secure immediate relative status.[5] It is in the context of this statutory framework that the contentions of the parties must be considered.

■ It is undisputed that at the time the instant petition was filed, the male plaintiff was the lawful spouse of the female plaintiff, an American citizen. It is equally undisputed that, although the parties now live apart, no divorce or legal separation has

2. Mr. Chan was admitted into the United States in 1972 as a non-immigrant student.

3. She apparently sent the letter as part of her obligation to keep the Service continuously informed.

4. However, as the Board of Immigration Appeals noted, at least as of July 7, 1977, Mrs. Chan still wanted her petition approved and counsel "alluded to the possibility of a reconciliation."

5. 8 U.S.C. § 1154(b) describes the manner in which the Attorney General rules on such petitions. It provides in pertinent part: "After an investigation of the facts in each case . . . the Attorney General shall, if he determines that the facts stated in the petition are true and that the alien in behalf of whom the petition is made is an immediate relative specified in section 1151(b) . . . approve the petition and forward one copy thereof to the Department of State."

8 U.S.C. § 1361 further provides: "Whenever any person makes application for a visa or any other document required for entry, or makes application for admission, or otherwise attempts to enter the United States, the burden of proof shall be upon such person to establish that he is eligible to receive such visa or such document, or is not subject to exclusion under any provision of this [Act], and, if an alien, that he is entitled to the . . . nonquota immigrant . . . status claimed as the case may be. If such person fails to establish to the satisfaction of the consular officer that he is eligible to receive a visa or other document required for entry, no visa or other document required for entry shall be issued to such person, nor shall such person be admitted to the United States unless he establishes to the satisfaction of the Attorney General that he is not subject to exclusion under any provision of this [Act]."

taken place and no proceedings for divorce or legal separation have been instituted. Nevertheless, and in spite of the fact that plaintiffs' marital relationship has never been dissolved and that they clearly meet the literal requirements of the law, the Board of Immigration Appeals, relying on its own earlier decision in *Matter of Sosa,* Interim Decision 2469 (BIA 1976),[6] decided that the Chans' marriage was "nonviable," that sections 1151(b) and 1154(b) therefore do not apply, and that their petition would not be approved. For a number of reasons, the Board's construction of the law is plainly *wrong.*

■ First. There is no support for defendant's interpretation in the language of the Statute. Section 1154(b) explicitly directs[7] the Attorney General to grant immediate relative status to the spouse of an American citizen, without any reference whatever to marriage viability or solidity. Indeed, section 1101(a)(35) of title 8, U.S. Code, the definitional section, excludes from the definition of "spouse" only those situations "where the contracting parties [to the marriage ceremony] are not physically present in the presence of each other," and even that condition is waived when "the marriage shall have been consummated."[8] Plaintiffs here were united by a marriage ceremony, they were present at that ceremony, and the marriage was consummated.

■ Second. The Service's interpretation is unsupported by its own and the Department of Justice's regulations. No rule or regulation issued by the Attorney General or the Immigration and Naturalization Service requires the existence of a "viable" marriage as a precondition to the grant of immediate relative status. To the contrary, 8 C.F.R. § 204.2(2) implies that no such precondition exists for it requires only that "a petition [for classification to immediate relative status] submitted on behalf of a wife or husband . . . must be accompanied by a certificate of marriage to the beneficiary and proof of the legal termination of all previous marriages of both husband and wife"—requirements that, too, were met in the instant case. Likewise, 8 C.F.R. § 205.1(a)(4) quite appropriately conditions the revocation of a petition merely upon the "legal termination" of the relationship of husband and wife, not upon any assumed dissolution of the marriage by reference to a standard not known to the law of domestic relations.

Third. There is no support for defendant's interpretation in the judicial case law. The only court to date to construe a provision similar to the one at issue here squarely determined the Service's construction to be in error.[9] In *Whetstone v. Immigration and Naturalization Service,* 561 F.2d 1303

---

6. In *Sosa,* the immigrant visa of an alien admitted to the United States on the basis of his marriage to a citizen, but whose marriage was never consummated, and whose wife refused to live with him after the first week, was declared invalid on the ground that he did not have a viable marriage at the time of his visa application.

7. The Board of Immigration Appeals has suggested both in this case and in *Sosa* that it, or the Attorney General, may have authority to grant or withhold benefits under the laws here under consideration. Although 8 U.S.C. § 1361 places the burden of proof on a petitioner to establish his status, once he does so, the benefits are awarded by law, and defendant and his subordinates have no power either to deny them or to exercise discretion with respect thereto.

8. This definition does not preclude the Service from refusing to recognize fraudulent marriages, for such marriages are deemed never to have come into existence. See p. 131, *infra.*

9. *Scalzo v. Hurney,* 225 F.Supp. 560 (E.D.Pa. 1963), *affd.,* 338 F.2d 339 (3rd Cir. 1964), relied on by defendant, holds only that an alien wife does not acquire a vested right by virtue of her marriage to a citizen, and when a citizen-husband withdraws his petition for immediate relative status for his estranged wife, the Attorney General may revoke the petition. *McLat v. Longo,* 412 F.Supp. 1021 (D.V.I.1976), also cited by defendant, merely reaffirms the familiar rule—as its reliance on *United States v. Abdel-Khaleq,* 354 F.2d 642 (7th Cir. 1965), shows— that a fraudulent or sham marriage creates no rights under the immigration laws. Here, however, the INS has never challenged the validity of the Chans' marriage and indeed has emphasized that it does *not* contend their marriage to be a sham. See p. 131, *infra.*

(9th Cir. 1977),[10] the U.S. Court of Appeals for the Ninth Circuit was faced with construing 8 U.S.C. §§ 1101(a)(15)(K) and 1184(d), the statutes governing admission of fiances of United States citizens. If anything, those particular provisions are more hospitable to the Service's position than the section here involved, for section 1184(d) (the "fiance" section) expressly refers to the parties' "bona fide intention to marry" and to their actual willingness "to conclude a valid marriage," while no comparable language can be found in the "immediate relative" provisions of the immigration laws. Nevertheless, the court rejected arguments similar to those advanced by the Service in the instant case, holding (561 F.2d at 1306):

> We find no requirement in the statute that . . . a marriage, once lawfully performed according to state law, is to be deemed insufficient proof of 'a valid marriage' merely because at some later time the marriage is either terminated, or the parties separate. The only proof in this case establishes that petitioner's marriage is not terminated. So far as the record discloses the facts, she is today married to Whetstone although they are not living together. There is no requirement that a marriage, entered into in good faith, must last any certain number of days, months or years. Much less is there any requirement that a *bona fide and lasting marital relationship* (whatever that may mean) exists as of the time the INS questions the validity of the marriage.

Defendant makes no serious attempt to distinguish the *Whetstone* decision and urges instead that the U.S. Court of Appeals for the Ninth Circuit simply erred. For the reasons stated herein, this Court is of the view that *Whetstone* correctly interprets the law.

**10.** Actually, the U.S. Court of Appeals for the Ninth Circuit foreshadowed its *Whetstone* ruling in *Bark v. Immigration and Naturalization Service,* 511 F.2d 1200 (9th Cir. 1975). See pp. 130–131, *infra.*

**11.** On the basis of that distinction, the Board should have treated the present plaintiff as it did Gonzalez-Portillo rather than placing him in the same category with Sosa. Actually, Mr.

Fourth. The construction proposed by the Service is inherently incompatible with due process, as it would vest in that agency an unreasonably wide, and essentially unreviewable, discretion to determine which marriages are or are not viable.

Webster's New Collegiate Dictionary (5th ed.) defines "viable" as "capable of living; . . . capable of growing or developing." In this case, the Immigration and Naturalization Service stated that a marriage which may be "floundering" would still be considered viable if it has a "reasonable chance of continuing." In *Matter of Sosa, supra,* the Board of Immigration Appeals concluded that the marriage was not viable and the alien was to be excluded where the alien husband worked a night shift, the citizen wife refused after a brief period to have sexual relations with him although he "begged" her to do so, and where she ultimately left him. In *Matter of Gonzalez-Portillo,* 13 I&N Dec. 309, 312 (BIA 1969), the Board upheld the viability of marriage because it thought there was "a reasonable chance of effecting a reconciliation." [11] On yet another occasion, *i. e.,* in the *Whetstone* case, the Immigration Judge having jurisdiction determined that a marriage was not bona fide largely because the husband was 27 years older than the wife.

 The disparate results in these representative decisions demonstrate the inherent unworkability of a standard which permits the Immigration and Naturalization Service to guess which marriages are likely to survive and which ones are not. Certainly in the absence of clear congressional direction—*e. g.,* statutory language that only viable marriages are to be regarded as valid for purposes of the immigration laws, together with a precise definition of viabili-

Chan presents an even stronger case than Mr. Gonzalez-Portillo. The parties in *Gonzalez-Portillo* not only had lived together for a lesser time period before separating than had the Chans but also, unlike the Chans who filed their petition during their period of cohabitation, the Gonzalez-Portillos did not apply for a visa until after their marital difficulties had escalated to the point of separation.

ty—that standard is untenable. The Immigration and Naturalization Service clearly could not, consistently with due process of law, be regarded as vested with both the authority to establish the vague and elusive concept of marriage viability and the enormous power to regulate and enforce that concept in actual practice.[12]

Defendant suggests that the Service's departure from domestic relations law as the basis for ascertaining the existence of a marriage relationship constitutes but an insignificant step. However, in fact that departure represents an intrusion into the most sensitive and private areas of life (see, e. g., *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973)) and has extremely dangerous implications.[13] INS has no expertise in the field of predicting the stability and growth potential of marriages—if indeed anyone has—and it surely has no business operating in that field.[14]

### III

Defendants point to the legislative history of the Immigration and Nationality Act, which refers to the reunification of families and the preservation of family units as among its purposes.[15] To be sure, in providing for preference visas for immediate relatives, the Congress was concerned with fostering and strengthening family relationships. But it is a considerable leap from the premise of that congressional purpose to the Service's conclusion that it is entitled to determine upon an ad hoc basis [16] which marriages, validly entered into under and sanctioned by state law, are entitled to full faith and credit and which ones are not.

■ Defendant says in this respect that any other result would leave the agency with fifty or more standards of marriage to consider rather than one national one. The short answer is that this consequence is inherent in our federal system, which leaves matters of marriage, divorce, and legal separation to the States.

---

**12.** If the INS decision here were to be upheld, the husband of an American citizen would be excluded from the United States, and whatever chance there may be for a normal family life between the two plaintiffs would be extinguished. Such a course would hardly be calculated to preserve family life and family relationships, which is one of the principal purposes of the statutory provisions at issue here (see p. 130, *infra*). If it be thought that an expectation of reconciliation between the Chans is unlikely, the Court notes that there is some hope of this on this very record (note 4, *supra*), and that this hope is buttressed by the fact that the parties have never sought a legal separation or divorce. In this day and age marital separations and reconciliations are of course far from uncommon.

**13.** If marriage viability represents a valid notion in the law it logically also embraces such matters as sexual compatibility, financial security, family relationships, and the emotional attitudes of the spouses—all of which bear significantly upon the health and potential duration of marriages, that is, their viability. (For a description of INS involvement in intimate family matters, see the dissent in *Matter of Sosa, supra,* and the Board's decision in *Whetstone*). How, it may legitimately be asked, would the Service go about collecting evidence on these various subjects? What issues would be tried before the INS hearing officers and upon what

standards? How would the parties go about exonerating themselves since theirs is the burden of proof and since INS has ruled—in this case—that they must make an "affirmative showing" that the marriage has a reasonable chance of continuing? To consider these questions is to conclude that the viability standard, if allowed to persist, would inevitably lead the INS into invasions of privacy which even the boldest of government agencies have heretofore been hesitant to enter.

**14.** See *Bark, supra,* where the Court of Appeals for the Ninth Circuit cautioned that "any attempt to regulate their life styles, such as prescribing the amount of time they must spend together, or designating the manner in which either partner elects to spend his or her time, in the guise of specifying the requirements of a bona fide marriage would raise serious constitutional questions." 511 F.2d at 1201.

**15.** Although in *Matter of Blair,* 14 I&N Dec. 153 (1972), the Service held that an alien fiance of an American citizen was entitled to a record of admission for lawful permanent residence when his citizen spouse died before the filing of the petition.

**16.** As noted, no rules or regulations have ever been promulgated by the Service to define "viable marriage."

Defendant's suggestion that *Moon Ho Kim v. Immigration and Naturalization Service,* 168 U.S.App.D.C. 283, 514 F.2d 179 (1975), authorizes the Service to establish such a national standard is not well taken for several reasons.

First. *Moon Ho Kim* involved the construction of the term "adultery" as used in 8 U.S.C. § 1101(f)(2) for purposes of determining good moral character under the Immigration and Nationality Act. The Court ruled that the word appears but is nowhere defined in the congressional enactment, and that the differing standards of adultery among the states provide little guidance in that regard to the Immigration and Naturalization Service. In view of these circumstances it held the application of a uniform federal standard to be appropriate. Here, however, the Service need not search the jurisdictions for a suitable definition of "viable" marriage, for neither the term nor the concept is mentioned in any of the relevant immigration laws or regulations. Second. In *Moon Ho Kim,* both the Immigration and Naturalization Service and the Court were only dealing with adultery standards in the abstract, since there had been neither a prosecution nor a decision not to prosecute the alien by any official authority based upon any local adultery statute. Here, on the other hand, the State of Tennessee has acted through its marriage laws to create a legal marriage relationship, a relationship which has never been dissolved by Tennessee or any other State. There is thus nothing for the INS to decide unless it were deemed to have the authority to overrule the State of Tennessee on a matter clearly within that State's jurisdiction. Third. In *Moon Ho Kim,* the court was concerned with different and conflicting state standards of adultery, and the Service almost of necessity had to find and formulate one uniform standard if it was to enforce the immigration laws in accordance with the will of Congress. Insofar as marriage and divorce are concerned, however, not a single jurisdiction in the United States has ever

defined marriages in terms of their stability or viability as distinguished from their lawful creation and their dissolution by a court of law. The viability concept is strictly a creation of the Board of Immigration Appeals, contrary to the law in all the states. Whatever may be the power of the Congress, notwithstanding the Tenth Amendment to the Constitution, to establish for purposes of the immigration laws a species of "spouse" in terms of the viability of his or her marriage to the other spouse, as distinguished from the official, state-sanctioned marriage status,[17] this Court holds that the Immigration and Naturalization Service has no such power.

IV

Defendant cannot breathe life into its interpretation of the statute by an appeal to the principle that contemporaneous and consistent construction of a law by the agency administering it is entitled to considerable weight.

In the first place, an agency's interpretation cannot vary the plain words of a statute (*R.V. v. McGinnis Theatres & Pay T.V. v. Video Independent Theatres,* 386 F.2d 592 (10th Cir.), *cert. denied,* 390 U.S. 1014, 88 S.Ct. 1265, 20 L.Ed.2d 163 (1967); *Hometrust Life Ins. Co. v. U.S. Fidelity & Guaranty Co.,* 298 F.2d 379 (5th Cir. 1962); *Miller v. Laird,* 349 F.Supp. 1034 (D.D.C.1972); *Air Transport Association v. Brownell,* 124 F.Supp. 909 (D.D.C.1954)) nor need a court defer to an erroneous administrative construction. *Espinoza v. Farah Mfg. Co.,* 414 U.S. 86, 94 S.Ct. 334, 38 L.Ed.2d 287 (1973); *Association of American Railroads v. Costle,* 562 F.2d 1310 (D.C. Cir. 1977); *National Association of Regulatory Utility Commissioners v. F.C.C.,* 174 U.S.App.D.C. 374, 533 F.2d 601 (1976); see also *Castaneda-Gonzalez v. Immigration and Naturalization Service,* 564 F.2d 417 (D.C. Cir. 1977). Moreover, the construction here advanced was

---

17. Such an enactment would subvert traditional modes of domestic relations law and would thus raise substantial constitutional problems.

not contemporaneous with the statutory enactment,[18] and it has been far from consistent. Compare *Matter of Sosa, supra; Matter of Kitsalis,* 11 I&N Dec. 613 (1966); *Matter of Lew,* 11 I&N Dec. 148 (1965), with *Matter of Gonzalez-Portillo, supra; Matter of Blair,* 14 I&N Dec. 153 (1972); *Matter of Hays,* 14 I&N Dec. 188 (1972).

Surprisingly, the Board of Immigration Appeals has declined to follow *Bark v. Immigration and Naturalization Service, supra,* in which the U.S. Court of Appeals for the Ninth Circuit explicitly rejected as arbitrary the Service's notion that a separation suggests the absence of a bona fide marriage.[19] Likewise, as defendant's motions in this Court indicate, the Service also refuses to follow the more recent *Whetstone* decision. On that record, reliance on confusing prior agency interpretation constitutes essentially a bootstrap argument.

Finally, it should be noted that while defendant contends that a marriage must be "viable" at the time the Service renders its decision, there apparently is no prescribed time limit within which the Service must take final action on petitions.[20] The Court agrees with Judge Sneed, concurring in *Whetstone,* who concluded that "the statute does not require that the marriage be a satisfactory one at the time the Service acts on the petition of the alien" (561 F.2d at 1309).[21] To hold otherwise would be to make entitlement under the statute dependent upon the backlog in the office of a district director or the speed with which he chooses to act on a petition. In this case, moreover, the marriage was legally valid when it was entered, it was valid when the petition was filed, and under the laws of the State of domicile of the parties and indeed in all the jurisdictions of the United States it is equally valid today. The Service has not the slightest authority under any law to declare that marriage to be invalid by terming it to be no longer viable.

## V

The real concern of the Service is apparently with fraud. Certainly if a marriage is entered into for fraudulent purposes, that is, for the purpose of securing an alien's admission or continued residence in the United States, it may be deemed invalid for purposes of the immigration laws, and defendant would be justified in not regarding such an alien as an immediate relative. See, *e. g., Lutwak v. United States,* 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953); *United States v. Lozano,* 511 F.2d 1 (7th Cir. 1975); *Bark v. Immigration and Naturalization Service,* 511 F.2d 1200 (9th Cir. 1975); *De Figueroa v. Immigration and Naturalization Service,* 501 F.2d 191 (7th Cir. 1974); *United States v. Sacco,* 428 F.2d 264 (9th Cir. 1970). Not only is there no claim of fraud here, but the Board of Immigration Appeals expressly noted the absence of any contention that this marriage was a sham at its inception, or that it was entered into for the purpose of evading the immigration

**18.** Defendant so conceded in its memorandum in support of motion for summary judgment (pp. 129–130). The relevant statutes were enacted in 1952, and the Board's interpretations urged herein did not begin until approximately 1965.

**19.** The court noted, quite appropriately, that it would be unable to concur in such a conclusion "unless we are reasonably assured that it is more probable than not that couples who separate after marriage never intended to live together." 511 F.2d at 1202.

**20.** The time lag between the filing of the instant petition and the district director's decision was fifteen months, and between the district director's decision and the Board's decision an additional sixteen months. While some

of the delay is appropriately accounted for by the government, the fact remains that over thirty months elapsed between the filing of the petition and the final administrative ruling.

**21.** See also the dissent of Board Member Appleman from the decision of the Board of Immigration Appeals in *Matter of Sosa, supra,* (slip op. at 8): "Whatever license may exist for the Service to scrutinize the 'validity' of a marriage in processing a visa petition, cannot extend to nonrecognition of a marriage, duly celebrated, valid in its inception, consummated, in existence over a year, recognized as valid by the Government at the time of the alien's admission, and terminated by divorce, under the circumstances presented in this case."

laws.[22] Defendant's brief in this Court likewise concedes that plaintiffs intended to establish a home and a permanent marital relationship, and candidly states that the Service does not question the bona fide nature of the marriage when established (Memorandum, p. 9). It follows that the Chans had a valid and undissolved marriage which defendant was obligated to recognize.[23]

### VI

The Court concludes that the Immigration and Naturalization Service has misinterpreted the applicable statutes, and that the Attorney General's decision to deny plaintiffs' petition on that basis is arbitrary, capricious, and not in accordance with law. See *Camp v. Pitts, supra.* An order granting plaintiffs', and denying defendant's, motion for summary judgment will be entered.

---

**22.** For that reason, it dismissed the applicability of the "sham" or fraud cases such as *Bark v. Immigration and Naturalization Service, supra.*

**23.** See also, generally, Gordon & Rosenfield, *Immigration Law & Procedure,* vol. I, § 2.18a (1966).