**Prakash Gobindram MANWANI and Katherina Constantino Manwani, Plaintiffs,**

v.

**U.S. DEPARTMENT OF JUSTICE, IMMIGRATION AND NATURALIZATION SERVICE, Defendant.**

**No. C–C–88–41–M.**

United States District Court, W.D. North Carolina, Charlotte Division.

April 23, 1990.

Alan S. Gordan, Law Offices of Alan S. Gordan, P.A., Charlotte, N.C., and Lucas Guttentag and Judy Rabinovitz, American Civ. Liberties Union Foundation, Immigration Task Force, New York City, for plaintiffs.

Charles E. Lyons, Asst. U.S. Atty., and David V. Bernal, Atty., Office of Immigration Litigation, Civ. Div., Dept. of Justice, Washington, D.C., for defendant.

## FINDINGS OF FACT

McMILLAN, District Judge.

1. This litigation challenges the constitutionality of Section 5(b) of the Immigration Marriage Fraud Amendments of 1986, Pub.L. No. 99–639, 100 Stat. 3537 ("IMFA")

### A. *Plaintiffs.*

2. Plaintiffs are Katherina Manwani and her husband, Prakash Manwani. Mrs. Manwani is a native-born citizen of the United States. [Affidavit of Katherina Manwani at ¶ 1, Exhibit A to Plaintiffs' Cross–Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment, filed September 5, 1989.[1]]

3. Mr. Manwani is a citizen of India who legally entered the United States in 1983. [Exh. B, P. Manwani Aff. at ¶ 1; Plaintiffs' Statement of Material Facts No. 10, filed September 5, 1989.[2]]

4. The Manwanis began dating in 1984 and had been dating seriously for more than a year when the Immigration and Naturalization Service (hereafter "Immigration Service" or "INS") initiated deportation proceedings against Mr. Manwani in May 1986. [Exh. B, P. Manwani Aff. at ¶ 2; Pl.Mat.Facts No. 1, 2, 3.]

---

1. Unless otherwise indicated, all exhibit references refer to the exhibits to Plaintiffs' Cross–Motion for Summary Judgment, filed on September 5, 1989, hereafter cited as "Exh. ____, ____[name] Aff. at ¶ ____."

2. Hereafter cited as "Pl.Mat. Facts No. ____."

5. The Manwanis continued to date while deportation proceedings were pending and became engaged to be married in January 1987. [Exh. A, K. Manwani Aff at ¶ 2; Exh. B, P. Manwani Aff. at ¶ 2, 3; Pl.Mat.Facts No. 4.]

6. They were married in May 1987. [Exh. A, K. Manwani Aff. at ¶ 2; Exh. B, P. Manwani Aff. at ¶ 3; Pl. Mat Facts No. 5.]

7. A son, Alexander Prakash Manwani, was born to them on November 16, 1988. Alexander is a native-born American citizen and is now over a year old. [Exh. A, K. Manwani Aff. at ¶ 5; Exh. B, P. Manwani Aff. at ¶ 9; Pl.Mat.Fact No. 7.]

8. The unrebutted evidence shows that the Manwanis entered into a bona fide marriage based on their love for each other and their desire to have a family. [Exh. A, K. Manwani Aff. at ¶ 3, 4; Exh. B, P. Manwani Aff. at ¶ 3; Exh. G, Letter of Daniel C. Biber, Ph.D. ("Biber letter"); Pl.Mat. Fact No. 6.]

9. The government does not contend that the Manwanis marriage is fraudulent. [Transcript of December 12, 1989 at 14:4–15:5.]

10. Based on all of the evidence, the court finds that the Manwanis' marriage is bona fide and that Mr. Manwani qualifies as a spouse of a United States citizen within the requirements of 8 U.S.C. §§ 1151(b) and 1154(b).

11. Prakash Manwani was found deportable by an immigration judge on July 15, 1987, solely on the ground that he had overstayed his tourist visa. [Exh. B, P. Manwani Aff. at ¶ 5; Pl.Mat.Fact No. 11, 12.]

12. The evidence as a whole establishes that but for Section 5(b), Mr. Manwani would have qualified for an approved visa petition as the husband of an American citizen. He would have been eligible to apply for immediate legal permanent resident status and would have been, if otherwise eligible, entitled to reside in the United States as a lawful permanent resident. [Pl.Mat.Fact No. 6, 11, 12, 13, 14.]

13. Mr. Manwani was granted "voluntary departure" status by the immigration judge based on the judge's finding of good moral character and the favorable exercise of discretion. [Exh. B, P. Manwani at ¶ 5; Pl.Mat.Fact No. 13, 14.]

14. A departure from the United States by Mr. Manwani will terminate his deportation proceedings. [8 C.F.R. § 204.1(a)(2)(C)(iii); Exh. K, Defendant's Responses to Plaintiffs' First Request for Admissions ("RFA I") No. 27, 28; Pl.Mat. Facts No. 42, 43.]

15. If Mr. Manwani had departed the United States before the Manwanis were married, the two-year residency bar of Section 5(b) would not have been applicable and he would have been eligible for immediate return as the immigrant spouse or fiance of an American citizen. [Exh. K, RFA I, No. 21, 27; Exh. J, Weinig Letter; Pl.Mat.Facts No. 41, 42.]

16. After Mr. Manwani's departure, the Manwanis could have married in the United States or abroad without being subject to Section 5(b). [Exh. K, RFA I, No. 27, 28; Pl.Mat.Fact No. 42.] If Mr. Manwani had returned to the United States illegally to marry Mrs. Manwani, he would not have been subject to Section 5(b). [Exh. K, RFA I, No. 28; Pl.Mat.Facts No. 43.]

17. The Manwanis are innocent victims of Section 5(b) who were unaware of the legal consequences of their decision to marry during the time that administrative proceedings were pending against Mr. Manwani. They entered into their marriage in good faith and without any intent to violate the law. [Exh. A, K. Manwani Aff. at ¶ 3, 4; Exh. B, P. Manwani Aff. at ¶ 3, 4; Pl. Mat. Facts No. 6, 8.]

18. Unless invalidated, Section 5(b) on its face and as applied compels the Manwanis either to move to India for two years or to endure two years of separation. 8 U.S.C. § 1154(h).

19. If Mr. Manwani is compelled to live in India for two years, the cost of travel will preclude Mrs. Manwani from visiting her husband more than once or twice. [Exh. B, P. Manwani Aff. at ¶ 13.]

20. An extended separation from her husband will cause Mrs. Manwani emotional hardship and will adversely affect the development of the Manwanis' baby son. [Exh. G, Biber Letter; Pl.Mat. Fact No. 15, 16.]

21. Mrs. Manwani is justifiably fearful that she and her son would face extremely difficult, if not dangerous, conditions if they were to move to India. Such a move would be detrimental to both of them. [Exh. A, K. Manwani Aff. at ¶ 7; Exh. B, P. Manwani Aff. at ¶ 14; Exh. G, Biber letter; Pl.Mat. Fact No. 18, 19, 20, 21, 22, 23.]

22. Mrs. Manwani has been under the continuing treatment of a physician since an ovary and fallopian tube were removed. She fears she would be unable to obtain adequate continuing medical care in India. [Exh. A, K. Manwani Aff. at ¶ 5, 7; Exh. B, P. Manwani Aff. at ¶ 14; Pl.Mat. Fact No. 22, 23.]

23. In addition, Mrs. Manwani is fearful of leaving her father, who is ill and was recently diagnosed as suffering from severe diabetes and heart disease. [Exh. A, K. Manwani Aff. at ¶ 6, 8–9; Exh. B, P. Manwani Aff. at ¶ 12, 13; Pl.Mat. Fact No. 18, 20.]

24. Even if the Manwanis were to live together in India for two years, lack of medical care would cause them to postpone having another child due to Mrs. Manwani's medical condition and the risk of another difficult pregnancy. [Exh. A, K. Manwani Aff. at ¶ 7; Pl.Mat. Fact No. 24.]

25. The court finds that Section 5(b)'s two-year foreign residency requirement serves no valid purpose as applied to the Manwanis. Compelling Mr. Manwani to reside abroad for two years will interfere with the Manwanis' ability to have a family and will impose enormous and unwarranted hardships on their marriage.

26. The court further finds that delaying an evaluation of the bona fides of the Manwanis' marriage until after Mr. Manwani has resided abroad for two years bears no meaningful relationship to the validity of the marriage at the present time or at the time it was celebrated.

B. *The Operation of Section 5(b) of IMFA.*

27. The government admits that Section 5(b) causes couples who have entered into valid marital relationships to be subject to the statute's two-year foreign residency requirement. [Exh. K, RFA I No. 29, 33; Pl.Mat. Fact No. 31.]

28. The pendency of deportation proceedings does not render the detection of fraud more difficult or render the INS' methods for determining marital validity less reliable or effective. [Exh. L, Defendants' Responses to Plaintiffs' First Request for Production of Documents ("Doc. Req. I") No. 10, 11; Pl.Mat. Fact No. 28.]

29. It is undisputed that many legitimate reasons—including financial, social and cultural—may cause a citizen and alien to delay their marriage and that the initiation of deportation proceedings may serve as a catalyst for a bona fide marriage. [Exh. K, RFA I No 33; Exh. C, Bernsen Aff. at ¶ 28, 29, 30; Exh. E, Affidavit of David Crosland ("Crosland Aff.") at ¶ 6; Pl.Mat. Fact No. 29.]

30. Administrative and judicial proceedings to determine an alien's right to remain in the United States may last for many months or years, during which time, relationships may form, evolve, mature, and culminate in the decision to marry. [Exh. K, RFA I No. 34; Bernsen Aff. at ¶ 29, 30; Pl.Mat. Fact No. 30.]

31. There is no evidence that the government would incur any substantial cost by affording aliens in deportation proceedings a procedure by which they could timely prove the validity of their marriage. The court finds that the fiscal and administrative burden that would result from affording a fair procedure to plaintiffs and others who marry during deportation proceedings is negligible. [Exh. C, Bernsen Aff. at ¶ 30.]

32. Section 5(b) does not apply to an alien in deportation proceedings who briefly leaves the United States and then marries an American citizen in the United

States or abroad. [Exh. K, RFA I No. 27, 28; Pl.Mat. Fact No. 42, 43.]

33. An alien in deportation proceedings who departs the United States (however briefly) is not subject to Section 5(b) even if he or she immediately returns to the United States illegally. [Exh. K, RFA I No. 28; Pl.Mat. Fact No. 43.]

34. Plaintiffs have demonstrated, through the government's admissions, that the operation of Section 5(b), as applied, distinguishes between aliens who briefly depart the United States before they marry and aliens who marry without first departing. [Exh. K, RFA I No. 21, 27, 28; Pl. Mat. Fact No. 41, 42, 43.] Accordingly, the court finds that Section 5(b) distinguishes among identically-situated couples on the basis of whether the alien spouse briefly departs the United States prior to marriage.

35. The court finds that the ability or willingness of an alien to travel abroad for a brief period of time prior to marriage does not bear any discernible relationship to the validity of a marriage or the likelihood of fraud.

36. Section 5(b) threatens valid marriages because it compels couples either to separate or to abandon their home during the earliest, vulnerable years of their relationship. [*See, e.g.*, N. Gerstel & H. Gross, *Commuter Marriages* 136–148 (1985); Chappell, *Married to the Army*, 1 New Soc. 354 (1983); Nice, *The Course of Depressive Affect in Navy Wives During Family Separation*, 148 Mil.Med. 341 (1983); Snyder, *Periodic Marital Separation and Physical Illness*, 48 Amer.J. Orthopsychiatry 637 (1978); McCubbin, Hunter & Dahl, *Residuals of War: Families of Prisoners of War and Servicemen Missing in Action*, 31 J.Soc. Issues 95 (1975).]

37. Plaintiffs have shown that a marriage is subject to less vigorous and less effective scrutiny if the alien spouse is residing abroad at the time that a marriage-based visa petition is adjudicated. [Exh. C, Bernsen Aff. at ¶ 12, 17, 18; Exh. K, RFA I No. 17, 18; Pl.Mat. Fact No. 38.]

38. Plaintiffs have shown that couples subject to Section 5(b) will eventually have their visa petition adjudicated while the alien spouse is residing abroad and that such marriages are therefore less effectively scrutinized than if the alien were permitted to remain in the United States. [Exh. C, Bernsen Aff. at ¶ 17; Pl.Mat. Fact No. 38.]

39. Couples subject to Section 5(b) may live apart during the two-year foreign residency period. In those cases, few of the normal indicia of married life by which to judge the validity of the marriage will be present, and the government's ability to ascertain marital validity is diminished. [Exh. C, Bernsen Aff. at ¶ 17, 19; Exh. M, Defendant's Responses to Plaintiffs' Second Request for Admissions ("RFA II") No. 6, 7; Pl.Mat. Fact No. 40.]

40. Couples who live abroad for two years as a result of Section 5(b) are not subject to the "conditional" permanent residence provision of Section 2 of IMFA, 8 U.S.C. § 1186a(g). [Bernsen Aff. at ¶ 20; Pl.Mat. Fact No. 39.]

41. It appears, based on all the foregoing, that Section 5(b)'s effectiveness, if any, at preventing, detecting or deterring marriage fraud is significantly outweighed by the harm that the statute imposes on bona fide marriages.

42. Three former General Counsel of the INS, with a combined service of almost 75 years with the Immigration Service, have unanimously condemned Section 5(b) as unnecessary to detect or deter marriage fraud, as unjustified in light of numerous equally or more effective means available to the government, and as unwarranted in light of the unprecedented penalty it imposes on the overwhelming majority of valid marriages. [Exh. C, Bernsen Aff.; Exh. D, Gordon Aff.; Exh. E, Crosland Aff.]

C. Facts Related to the INS "Marriage Fraud Survey."

43. The government's pleadings in this action have prominently featured the estimate of marriage fraud contained in an INS "survey" reported in the legislative history of IMFA. [Defendants' Memorandum of Points and Authorities in Support

of Motion to Dismiss at p. 4, filed March 26, 1988 ("Def. Mo. Dismiss"); Defendant's Memorandum of Points and Authorities in Support of Motion for Summary Judgment at p. 8, filed December 9, 1988 ("Def.Mem. S.J.").]

44. The "survey" regarding suspect marital relationships referred to in the legislative history of IMFA is the Investigations Pilot Fraud Survey ("IPFS") prepared in 1984 based on data collected in Houston, TX, Washington, DC, and Los Angeles, CA, in 1983 and 1984. [Nachtsheim Depo. at 118:1–9; Exh. K, RFA I No. 1; Pl.Mat. Fact No. 45.]

45. The conclusions of the IPFS regarding the frequency of fraud are based on the number of cases in which fraud was only *suspected* by the criminal investigators who carried out the survey. [Exh. K, RFA I No. 6, 7, 8; Nachtsheim Depo. at 112:10–13; Pl.Mat. Fact No. 50.]

46. The IPFS did not attempt or purport to collect data regarding actual adjudications of fraud or attempted fraud. [Exh. K, RFA I No. 6, 7, 8; Nachtsheim Depo. at 110:6–111:4; Pl.Mat. Fact No. 51.]

47. The INS never conducted any follow-up survey or studies to determine the actual frequency of fraud or attempted fraud among the cases reviewed for the IPFS. [Exh. K, RFA I No. 6, 7, 8; Nachtsheim Depo. at 91:23–92:3; 110:6–111:4; Pl.Mat. Fact No. 52.]

48. The INS has conceded and the evidence shows that the IPFS survey is not a statistically valid study of the suspected or actual incidence of marriage fraud. [Nachtsheim Depo. at 36:8–11; 92:7–13; 96:5–97:10; Exh. H, Declaration of Dr. James Robins ("Robins Decl.") at ¶ 4, 12, 15, 16, 19; Pl.Mat. Fact No. 61, 62.]

49. The person who designed and supervised the IPFS admits that "it would not be justified" to use the IPFS for purposes of recommending legislative reform. [Nachtsheim Depo. at 96:12–16; Pl.Mat. Fact No. 64.]

50. The INS Commissioner cited the IPFS to Congress in 1985 to support the need for IMFA even though high ranking officials in the INS Central Office were aware of and had discussed the limitations of the IPFS in 1984 and knew that the IPFS was not a valid or reliable survey of marriage fraud. [Nachtsheim Depo. at 92:21–93:17; 94:11–95:1; 95:12–96:3; Exh. V, Legislative History, Senate Hearings at 35 (*see* note 3, *infra*); Pl.Mat. Fact No. 66, 67.]

## CONCLUSIONS OF LAW

A. *The Immigration Marriage Fraud Amendments of 1986.*

1. Section 5(b) of IMFA is codified at 8 U.S.C. § 1154(h) and provides:

> Notwithstanding subsection [1154](a) of this section, a petition may not be approved to grant an alien immediate relative status or preference status by reason of a marriage which was entered into during the period described in [8 U.S.C.] section 1255(e)(2), until the alien has resided outside the United States for a 2–year period beginning after the date of the marriage.

The period described in section 1255(e)(2) is "the period during which administrative or judicial proceedings are pending regarding the alien's right to enter or remain in the United States." 8 U.S.C. § 1255(e)(2).

2. The legislative history reveals that Section 5(b) was not the subject of any specific debate or testimony.[3] Congress apparently did not intend IMFA to harm or penalize bona fide married couples. *See, e.g.,* 132 Cong.Rec. H8589 (daily ed. Sept. 29, 1986) (statement of Rep. Frank) (legislation would "deal with the abusers and the cheaters while doing minimal, if any dam-

3. Exh. V, Complete legislative history, including hearings, House debate and committee reports. *Fraudulent Marriage and Fiance Arrangements to Obtain Permanent Resident Immigration Status: Hearing Before the Subcommittee on Immigration and Refugee Policy of the Senate Committee on the Judiciary,* 99th Cong., 1st Sess. (1985); 132 Cong. Rec. H8585–90 (daily ed. Sept. 29, 1986); H.R.Rep. 906, 99th Cong., 2d Sess. (1986); S.Rep. 491, 99th Cong., 2d Sess. (1986). Portions of the legislative history are set forth in 1986 U.S.Code Cong. & Admin.News 5978–5985.

age at all, to the rights of law-abiding majority"). The statement of Senator Paul Simon, chief Senate sponsor of IMFA, confirms that the consequences of Section 5(b) were not intended.

> It appears now that the operation of Section 5 ... goes too far and infringes on the privacy and futures [sic] of married couples we had no intention of affecting.... [T]he American citizen should not be placed in the situation of having to choose between his or her country, career, and other family on the one hand and moving away to a foreign land where he or she may not know the language and customs or be able to work for a 2–year period on the other in order to live with the new spouse.

134 Cong.Rec. S1625 (daily ed. Feb. 29, 1988) (statement of Sen. Simon).[4]

3. Section 5(b) imposes a mandatory two-year foreign residency requirement on all marriages that are entered into during the pendency of the proceedings defined in 8 U.S.C. § 1255(e)(2). The law makes no exception and provides no waiver or other form of amelioration. Even if the Immigration Service recognizes and acknowledges that a marriage is bona fide in every respect, Section 5(b) imposes the mandatory two-year foreign residency rule if the marriage was entered into during proceedings. *See* Exh. K, RFA I, No. 29; Pl.Mat. Fact No. 25. Accordingly, the plaintiffs are irrevocably subject to the two-year provision.

4. Section 5(b) compels couples either to forego their right to marry or to suffer severe consequences if they elect to marry despite the law's provisions. Section 5(b) constitutes both a *de facto* prohibition on marriage and a direct and substantial burden on the couple's "freedom of [marital] choice." *Zablocki v. Redhail,* 434 U.S. 374, 387, 98 S.Ct. 673, 681, 54 L.Ed.2d 618 (1978). *Cleveland Bd. of Educ. v. LaFleur,* 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974); *Carey v. Population*

*Services Int'l,* 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977).

5. A couple that abandons or delays their right to marry suffers a deprivation of marital association that is self-evident. A couple that marries despite the statute's sanction suffers an unprecedented burden as a result: either live apart for two years or abandon their American residence. Whatever the couple does, Section 5(b) imposes a direct and substantial intrusion on marriage and on freedom of choice in marital affairs.

6. A forced and lengthy marital separation caused by Section 5(b) constitutes a severe if not debilitating burden on the marital relationship. If "the [spouse] ... of an American citizen would be excluded from the United States ... whatever chance there may be for a normal family life ... would be extinguished." *Chan v. Bell,* 464 F.Supp. 125, 130 n. 12 (D.D.C. 1978). *See generally* N. Gerstel & H. Gross, *Commuter Marriages* 136–148 (1985); Chappell, *Married to the Army,* 1 New Soc. 354 (1983); Nice, *The Course of Depressive Affect in Navy Wives During Family Separation,* 148 Mil.Med. 341 (1983); Snyder, *Periodic Marital Separation and Physical Illness,* 48 Amer.J. Orthopsychiatry 637 (1978); McCubbin, Hunter & Dahl, *Residuals of War: Families of Prisoners of War and Servicemen Missing in Action,* 31 J.Soc. Issues 95 (1975).

7. Alternatively, to avoid those consequences, a citizen seeking to preserve marital unity is compelled to give up her birthright of residency in the United States and is "forced to sacrifice the opportunities and advantages offered by her [native] country." *Pena v. Kissinger,* 409 F.Supp. 1182, 1184 (S.D.N.Y.1976).

B. Fiallo v. Bell.

8. The government's defense of Section 5(b) (and that of the courts that have rejected challenges to the law) hinges on the applicability of *Fiallo v. Bell,* 430 U.S. 787, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977), and the

---

**4.** As of the date of this submission, no legislation has been introduced to repeal or amend Section 5(b).

contention that *Fiallo* compels this court to defer to Congress and uphold the statute. Def.Mem.S.J. at 9–18. Specifically, the government argues that "this Court is obliged to apply the *Fiallo* standard. . . ." Def.Mem.S.J. at 10. *See generally* Transcript of December 12, 1989 at 5–7, 9–11, 16–18.

9. The court rejects the government's sweeping contention. *Fiallo* and the principles on which it rests do not countenance the deprivation of due process and equal protection legislated by Section 5(b). Notably, the D.C.Circuit recently held that *Fiallo* does not apply to Section 5, *Escobar v. INS*, 896 F.2d 564 (D.C.Cir.1990) (distinguishing *Fiallo* and declaring Section 5 violative of procedural due process), and the Ninth Circuit has stated that "neither the Supreme Court nor this Circuit have ruled on the constitutionality of [8 U.S.C.] § 1154(h) *or any substantially similar provision* of the Immigration and Nationality Act. . . ." *Blancada v. Turnage*, 891 F.2d 688, 690 (9th Cir.1989) (emphasis added).

10. *Fiallo v. Bell* is not applicable to Section 5(b) for several reasons. First, the government has failed to acknowledge the crucial distinction enshrined in *Fiallo* (and numerous prior and subsequent decisions) between statutes that define categories of admissible aliens and statutes that deprive citizens or aliens of procedural rights.

11. Section 5(b)'s abrogation of procedures whereby couples who marry during deportation proceedings can timely demonstrate marital validity is not governed by the holding or reasoning of *Fiallo v. Bell*. In *Fiallo*, the plaintiffs sought to compel the admission of a category of aliens whose relationship to American citizens was completely outside the statutory framework and the definition of "immediate relative." The challenged provision concerned "which *classes* of aliens may lawfully enter the country." 430 U.S. at 794, 97 S.Ct. at 1479 (emphasis added). The Court held that such line drawing by Congress defining which relationships are within, and which are outside, the immediate relative and preference system is subject to substan-

tial—though not complete—judicial deference. 430 U.S. at 793 n. 5, 97 S.Ct. at 1478 n. 5.

12. However, *Fiallo* requires the courts to maintain the distinction between statutory provisions that set forth categories of familial relationships and provisions that establish procedures designed to prevent circumvention of lawful admission requirements. *Fiallo* emphasized that "Government *procedures* designed to stem the illegal entry of aliens" are subject to traditional constitutional scrutiny. 430 U.S. at 794, 97 S.Ct. at 1479 (emphasis added).

13. This long-standing distinction between provisions defining the qualifying familial relationships, and provisions insuring that aliens who claim eligibility are in fact eligible, is fundamental. *Compare Fiallo v. Bell with Ali v. INS*, 661 F.Supp. 1234 (D.Mass.1986), and *Stokes v. INS*, 393 F.Supp. 24 (S.D.N.Y.1975). *Accord Landon v. Plasencia*, 459 U.S. 21, 35, 103 S.Ct. 321, 330, 74 L.Ed.2d 21 (1982) (courts, not Congress or the INS, must determine "whether the procedures meet the essential standard of fairness under the Due Process Clause . . ."). *See INS v. Chadha*, 462 U.S. 919, 940–41, 103 S.Ct. 2764, 2778–79, 77 L.Ed.2d 317 (1983) ("The plenary authority of Congress over aliens . . . is not open to question, but what is challenged here is whether Congress has chosen a *constitutionally permissible means* of implementing that power") (emphasis added). See generally *Wong Wing v. United States*, 163 U.S. 228, 16 S.Ct. 977, 41 L.Ed. 140 (1896); *Yamataya v. Fisher, (The Japanese Immigrant Case)*, 189 U.S. 86, 23 S.Ct. 611, 47 L.Ed. 721 (1903).

14. Section 5(b) by design and operation, necessarily constitutes a "procedure[ ] designed to stem [ ] illegal entry." *Fiallo v. Bell*, 430 U.S. at 794, 97 S.Ct. at 1479. Instead of a timely interview or investigation to determine the bona fides of a marriage, Section 5(b) imposes a two-year delay in the adjudication of marital validity and functions as a "trial-by-ordeal" designed to detect fraudulent marriages. Only those

marriages that survive the delay are deemed valid.[5]

15. This statutory enactment for distinguishing between bona fide and sham claims is entirely different than the classification of immigrant categories upheld in *Fiallo*. Section 5(b) maintains the existing category of family relationships but delays and distorts the method for determining marital validity and for denying immigrant visas to aliens who base their claim on a fraudulent marriage.

16. Unlike *Fiallo*, plaintiffs' challenge is on behalf of a citizen and an alien who are admittedly and explicitly *within* the definition of "immediate relative" and is directed to the *procedure* legislated by Section 5(b) for ferreting out sham marriages. Plaintiffs are not attempting to expand the definition of "immediate relative" as the *Fiallo* plaintiffs were. They seek only a fair and timely opportunity to prove that their marriage qualifies under the existing (and unchanged) immediate relative provision. 8 U.S.C. § 1151(b).

17. *Landon v. Plasencia*, decided after *Fiallo*, demonstrates the important distinction between statutory classifications and constitutional procedures. The Court reiterated that aliens protected by the Due Process Clause must be afforded *constitutionally* sufficient procedures regardless of the *statutory* categories that Congress may have created. The Court recognized Congress' power to classify aliens but held that due process governed the sufficiency of procedural rights regardless of the statutory category. 459 U.S. at 32, 103 S.Ct. at 329.

18. *Plasencia* also holds that proper constitutional analysis of procedural due process claims requires a traditional balancing of competing interests, *not* absolute deference to congressional legislation. *Id.* at 34, 103 S.Ct. at 330 (employing three-prong due process balancing test set forth in *Mathews v. Eldridge*, 424 U.S. 319, 334–35, 96 S.Ct. 893, 902–03, 47 L.Ed.2d 18 (1976)). Indeed, if it were otherwise, Congress could deprive aliens of all procedural safeguards simply by legislating them away. That is demonstrably not the case. *See Kwong Hai Chew v. Colding*, 344 U.S. 590, 73 S.Ct. 472, 97 L.Ed. 576 (1953); *Yamataya v. Fisher, supra; Wong Wing v. United States, supra.*[6]

19. In *Escobar v. INS* the D.C. Circuit recognized the fundamental distinction between substantive and procedural immigration provisions, and held that Section 5 imposed an unconstitutional procedural requirement. The court explained:

Thus the question remains as to whether Section 5 must be viewed as substantive or procedural. Before its enactment, persons in the Escobars' circumstance had a substantive right to INS consideration of a marriage petition and, if the INS determined the marriage to be *bona fide*, to "immediate relative" status for the alien spouse. Section 5 did not revoke or alter this statutory right. Rather, it provided that regardless of whether the marriage was *bona fide* or not, the citizen's right to have the alien spouse declared an "immediate relative" would be deferred while the alien spent two years abroad.

**5.** In *Anetekhai v. INS*, 876 F.2d 1218 (5th Cir. 1989) the Fifth Circuit acknowledged that Section 5(b) constitutes a *"procedure* that a couple must follow in order for the alien spouse to obtain preferential status...." 876 F.2d at 1220 (emphasis added). *See also id.* at 1223 ("procedures by which that policy may be implemented"); *id.* (Congress within its power in establishing this "policy and procedure"). But the court then asserted that Congress, "in effect, created two classes of alien spouses." *Id.*

However, Section 5(b) creates two classes of aliens only insofar as it deprives one class of their right to *procedural* due process. Such a classification is no more defensible than Congress' earlier effort to deprive one class of aliens i.e., Chinese, of a hearing prior to imprisonment, which the Court held violated the Fifth Amendment. *See Wong Wing v. United States, supra.*

**6.** The distinction between procedures and classifications is equally mandated by the fact that a legislature's power to create liberty or property interests by statute does *not* confer the power to dictate the procedures by which such interests may be abridged. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985).

Under these circumstances, this deferral must be viewed as procedural, not substantive.

In the present context a substantive provision is one that grants a status, whereas a procedural provision is one subordinate to the substantive grant and focusing on how or when a decision is to be made to award the previously authorized substantive status. A procedural provision is, in other words, one that does not take away the statutory entitlement but is aimed at the process by which the entitlement is gained.

*Escobar v. INS*, 896 F.2d at 567.

20. As the *Escobar* court explained, Section 5(b)'s procedural nature is demonstrated in part by the fact that the statute defers the *timing* of when the determination of marital validity is made, but does not "revoke or alter [the] ... statutory right." *Id.* at 567. Plaintiffs "seek only the opportunity to demonstrate now, as opposed to two years from now, that [Mr. Manwani] ... meets the definition [of immediate relative]." *Id.* at 568. In short, "[t]he government is willing to hear the evidence; the only question is *when* it will do so." *Id.* (emphasis added). Section 5(b) legislates a mandatory two-year delay in the adjudication of marital validity but leaves the underlying substantive definition and entitlement unchanged. *Id. See* 8 U.S.C. §§ 1151(b), 1154(b).

21. The procedural nature of Section 5(b) is also revealed by the face of the statute, the evolution of the INA, and the purpose of IMFA. The statutory provision is codified at 8 U.S.C. § 1154(h) and is contained in the provision entitled *"Procedure for granting immigrant status."* (Emphasis added). Thus by the statute's own terms, the two-year requirement creates a *procedural* test for immigrant visa eligibility. *See also Escobar v. INS*, at 568 n. 7.

22. In addition, the Immigration Act as a whole continues to recognize that aliens with bona fide marriages qualify as immediate relatives, and the explicit purpose of IMFA is to deny visas based on *fraudulent* marriages. *See* H.R.Rep. 906, 99th Cong., 2d Sess. 1, 6 (1986), *reprinted in* 1986 U.S.Code Cong. & Admin.News 5978. *See generally* 132 Cong.Rec. H8589 (daily ed. Sept. 29, 1986) (statement of Rep. Frank); 134 Cong.Rec. S1625 (daily ed. Feb. 29, 1988), (statement of Sen. Simon). *Escobar*, at 568 ("the legislative history of Section 5 indicates that its primary aim was procedural").

23. The government's emphasis that Section 5(b) was enacted to deter marriage fraud (Def.Mem.S.J. at 17) likewise confirms the statute's procedural nature. A deterrence purpose is served only if the statute operates to distinguish between valid and sham relationships—a manifestly *procedural* function—and not if it establishes the ultimate categories of qualifying relationships. As *Escobar* explained, Section 5(b) "was intended to make sham marriages less attractive. Its apparent goal was to ferret out sham marriages from bona fide marriages, thus enhancing the accuracy of the process of awarding 'immediate relative' status.... [It] is an effort to increase the likelihood that only *bona fide* alien spouses, whatever the time of the marriage, will obtain lawful status...." *Escobar v. INS*, at 568. Such a function is manifestly procedural.[7]

24. Second, *Fiallo* is not applicable to Section 5(b) because the citizen's statutory right in this case distinguishes this claim from that in *Fiallo* under the Supreme Court's own explicit language. In *Fiallo* the majority stressed that "the thoughtful dissenting opinion" of Justice Marshall had decided "not to accord preference status to a particular class of aliens...." *Id.* at 573. However, as noted previously, a classification that simply determines that a subset of otherwise eligible aliens will be deprived of *procedural* rights is not entitled to judicial deference. *See, e.g., Wong Wing v. United States, supra.*

7. The dissent in *Escobar v. INS* agreed with the importance of distinguishing between substantive and procedural enactments and that procedural provisions are "subject to more searching due process review...." At 573 (Wald, C.J., dissenting) (comparing *Fiallo* with *Plasencia*). However, it "reluctantly" concluded (At 573) that Section 5 was substantive because Congress

"would be persuasive if its basic premise were accepted ... that the relevant portions of the Act grant a 'fundamental right' to American citizens...." *Fiallo v. Bell,* 430 U.S. at 795 n. 6, 97 S.Ct. at 1479 n. 6. In *Fiallo* no such statutory right existed because the Act excluded the very relationship that the plaintiffs were seeking to include.

25. In contrast, "the Act [does] grant a fundamental right" to the American citizen plaintiff challenging Section 5(b). The spousal relationship is explicitly recognized in the Act and grants citizens the *right* to an approved immediate relative visa petition for a bona fide spouse. 8 U.S.C. § 1154(b). Thus, the crucial factor on which the *Fiallo* majority relied—the absence of a statutory entitlement—distinguishes *Fiallo* since plaintiffs' entitlement is *codified in the Immigration Act.* Accordingly, under *Fiallo* itself, its reasoning is not applicable.

26. Finally, the deferential *Fiallo* standard is inapposite to the constitutionality of Section 5(b) because, unlike the statute at issue in that case, Section 5(b) imposes an affirmative penalty based on the exercise of a fundamental right.

27. As set forth below, (Conclusions of Law No. 39–40, 77, *infra*) the two-year foreign residency penalty of Section 5(b) is imposed *because* the couple got married. But for the marriage, the two-year bar would not be triggered. If the Manwanis had left the United States without getting married, Mr. Manwani would be eligible for immediate return. But because they married, Mr. Manwani is subject to the two-year bar. Findings of Fact No. 14–16. The government has failed to recognize

that the statute challenged in *Fiallo* imposed no such penalty.

28. When Congress affirmatively penalizes the exercise of a fundamental constitutional right, it is not acting pursuant to a "facially legitimate and bona fide" reason. *Kleindienst v. Mandel,* 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972). Neither *Fiallo v. Bell* nor *Kleindienst v. Mandel* concerned an immigration statute that imposed additional penalties solely because of the exercise of constitutional rights.

29. In *Fiallo* the statute at issue *failed to include* in its eligibility definition one category of relationships—the illegitimate children of men—that the *Fiallo* plaintiffs contended should have been included. But the statutory provision did not impose a penalty or additional burden triggered by the citizen's or alien's exercise of a constitutional right. In *Mandel* the INS' denial of a visitor's visa was upheld because the Attorney General demonstrated a reason for the denial that was unrelated to the plaintiffs' constitutional rights. The Court did not authorize the INS to interfere with protected First Amendment rights in the absence of such a non-constitutional rationale. 408 U.S. at 769, 92 S.Ct. at 2585.[8]

30. Recent judicial decisions have recognized that the Immigration Act may not penalize the exercise of a constitutional right. *See Abourezk v. Reagan,* 592 F.Supp. 880, 887 (D.D.C.1984), *rev'd and remanded on other grounds,* 785 F.2d 1043 (D.C.Cir.1986), *aff'd by an equally divided Court,* 484 U.S. 1, 108 S.Ct. 252, 98 L.Ed.2d 1 (1987) (First Amendment imposes limits on the government's power to exclude aliens and government "may not, con-

---

8. The Office of the Solicitor General has recognized the limited scope of *Mandel.*

QUESTION [by the Court]: Mr. Wallace, may I ask whether you agree with the dissent in the Court below, that *Kleindienst v. Mandel,* necessarily upheld the constitutionality of the exclusion of communists based on their political beliefs?

Was that, do you agree that that was the necessary holding of *Mandel?*

MR. WALLACE [Deputy Solicitor General]: I do not read *Kleindienst v. Mandel* as necessarily holding that. It said that there was a facially legitimate reason for that particular

exclusion, *because Professor Mandel had violated restrictions on his visa, in past entries.*

And that that was a sufficient basis to uphold the visa, here, and to override any First Amendment claim that was implicated on behalf of those who invited him. So, I cannot say that we can read *Kleindienst v. Mandel* as having resolved that question so definitively, with respect, I have to say that is slightly overstated in that dissenting opinion.

*Reagan v. Abourezk,* No. 86–656, Transcript of Proceedings, October 5, 1987 at 12–13 (emphasis added).

sistent with the First Amendment, deny entry solely on account of the content of speech");[9] *American–Arab Anti–Discrimination Committee v. Meese*, 714 F.Supp. 1060, 1083–84 (C.D.Cal.1989) *appeal filed* No. 89–55358 ("*ADC v. Meese*") (several provisions of the INA that penalize aliens for exercising their First Amendment rights held unconstitutional).[10] Since Section 5(b) imposes such a penalty, neither *Fiallo* nor *Mandel* is applicable.[11]

■ 31. For all of the aforementioned reasons, the court finds that the deferential standard of review applied in *Fiallo* and advocated by the government does not apply to the review of Section 5(b). Accordingly, Section 5(b) must be reviewed in light of established due process principles.

C.   Interests Affected By Section 5(b).

32.   Section 5 implicates the constitutionally-protected interest of both Mrs. Manwani and Mr. Manwani.

1.   Mrs. Manwani.

33.   As a United States citizen, Mrs. Manwani has several distinct interests that are interfered with by Section 5(b). First, her right to marriage and marital association is protected by the Constitution itself.

34.   The right to marry is grounded directly in the Constitution. Marriage is among as "the most important relations in life." *Maynard v. Hill*, 125 U.S. 190, 205, 8 S.Ct. 723, 726, 31 L.Ed. 654 (1888). The intimate decisions incident to marriage involve "a right of privacy older than the Bill of Rights...." *Griswold v. Connecticut*, 381 U.S. 479, 486, 85 S.Ct. 1678, 1682, 14 L.Ed.2d 510 (1965). *See also Skinner v. Oklahoma*, 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942).

■ 35. Marriage, marital association and the decisions related to marriage are a central element of the fundamental right of personal privacy protected by the Due Process Clause. *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923) (the right "to marry, establish a home and bring up children" is a central part of the liberty protected by the Due Process Clause); *Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. at 639, 94 S.Ct. at 796 ("freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause...."). *See also Carey v. Population Services Int'l*, 431 U.S. at 684–85, 97 S.Ct. at 2015–16; *Griswold v. Connecticut, supra; Skinner v. Oklahoma, supra; Maynard v. Hill, supra.*

■ 36. Restrictions on marriage are subject to the most exacting scrutiny. A governmental burden on the right to marry need not amount to an absolute prohibition in order to constitute an impermissible interference with marital association. A statute that "directly and substantially" causes a "serious intrusion into the[ ] freedom of choice" whether to marry is subject to strict scrutiny. *Zablocki v. Redhail*, 434 U.S. at 387, 98 S.Ct. at 681. *See also Shapiro v. Thompson*, 394 U.S. 618, 89

---

9.   On remand the district court reaffirmed its holding. "It is still obvious to the Court, as it was previously, that 'an alien invited to impart information and ideas to American citizens in circumstances such as these may not be excluded ... *solely on account of his proposed message.*'" *Abourezk v. Reagan*, No. 83–3739, slip op. at 7 n. 8, 1988 WL 59640 (D.D.C. June 7, 1988) (citation omitted) (emphasis added), *remanded on other grounds sub nom. City of New York v. Baker*, 878 F.2d 507 (D.C.Cir.1989).

10.   *ADC v. Meese* rests on the special force of the First Amendment, a provision on which the right to marriage and marital association is also partially grounded. *See Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 545, 107 S.Ct. 1940, 1945, 95 L.Ed.2d 474 (1987)

(First Amendment protects family relationships). *Accord Newborn v. Morrison*, 440 F.Supp. 623, 626 (S.D.Ill.1977).

11.   *Mandel* is dubious authority for an additional reason since it did not confront the distinction between an immigrant and non-immigrant (visitor's) visa. Mandel was applying for, and was denied, a type of temporary visa that is not predicated on an established relationship between the alien visitor and the United States or an American citizen. In contrast, an immediate relative immigrant visa by its very nature may be obtained *only* if an American citizen petitions on behalf of the alien. And where such a relationship exists with a citizen-spouse, approval of the visa petition is mandatory. 8 U.S.C. § 1154(b).

S.Ct. 1322, 22 L.Ed.2d 600 (1969) (restrictions that burden fundamental right to travel are unconstitutional).

■ 37. The right to marital association is equally protected in the immigration context. *See Ali v. INS,* 661 F.Supp. at 1246 n. 6. *Accord Israel v. INS,* 785 F.2d 738, 742 n. 8 (9th Cir.1986); *Stokes v. INS, supra. See also Landon v. Plasencia,* 459 U.S. at 34, 103 S.Ct. at 330; *Bark v. INS,* 511 F.2d 1200, 1201 (9th Cir.1975); *Chan v. Bell,* 464 F.Supp. at 130. Here too, a burden on familial association triggers due process even in the absence of an absolute prohibition. *Polovchak v. Meese,* 774 F.2d 731, 734 (7th Cir.1985). Therefore, Section 5(b) indisputably burdens a constitutionally-protected interest.

■ 38. Even if the burden were less clear and direct, the analysis of the prior courts that have upheld Section 5(b) is misguided because it erroneously discounts the law's impact on the fundamental right to marry. In each case the courts emphasized that the citizen spouse "has no constitutional right to have her alien spouse remain in the country." *Anetekhai v. INS,* 876 F.2d at 1222 n. 5. *See, e.g., Almario v. Attorney General,* 872 F.2d 147, 151 (6th Cir. 1989) ("the Constitution does not recognize the right of a citizen spouse to have his or her alien spouse remain in this country"); *Blackwell v. Thornburgh,* No. CV 89–1650–WMB, slip op. at 16–17 (C.D.Cal. Dec. 10, 1989); *Azizi v. Thornburgh,* 719 F.Supp. 86, 95 (D.Conn.1989) *appeal pending* No. 89–6222.

39. This assertion is beside the point in the determination of whether a protected interest is affected or burdened by Section 5(b). Moreover, the significance attributed to the principle noted by the prior courts is based on a misreading of the cases involving a citizen who sought to prevent the deportation of a spouse. In each such case (upon which the previous Section 5(b) decisions rely), the alien was subject to deportation for reasons *wholly unrelated* to his or her marriage to an American citizen. *See Burrafato v. United States Department of State,* 523 F.2d 554, 555 (2d Cir. 1975) ("application denied on the ground that [alien] was ineligible for admission under Section 212(a) [8 U.S.C. § 1182(a) ]"); *Ansong v. District Director,* 596 F.Supp. 882, 888–89 (D.Me.1984) (deportation of alien *"in spite of* anticipated adverse effect" on marriage where alien is "otherwise subject to lawful deportation. . . . [and] where *independent* cause for such deportation exists. . . .") (emphasis added); *Silverman v. Rogers,* 437 F.2d 102, 107 (1st Cir.1970) (alien required to depart despite marriage because she had agreed to foreign residency requirement as a condition to obtaining J–1 student visa); *Swartz v. Rogers,* 254 F.2d 338 (D.C.Cir.1958) (alien required to depart despite marriage because of narcotics conviction); *Friedburger v. Schultz,* 616 F.Supp. 1315, 1316 (E.D.Pa. 1985) (alien required to depart despite engagement because he had agreed to foreign residency requirement as a condition of obtaining J–1 student visa); *Hermina-Sague v. United,* 416 F.Supp. 217, 218 (D.P.R.1976) (alien outside the United States ineligible for admission under 212(a), 8 U.S.C. § 1182(a)).

40. The Fifth and Sixth circuits, have committed a fundamental analytical error by equating the *Burrafato* line of cases (which concern a spouse's deportation for reasons *unrelated* to marriage) with the mandatory foreign residency of a spouse solely *because* of the marriage. *Burrafato* and related cases conclude only that marriage does not automatically "trump" unrelated provisions of the INA that render an alien ineligible for admission. In contrast, Section 5(b) imposes a penalty *because* a couple exercised its constitutional right to marry. The exile provision is triggered by the act of marriage,[12] and therefore imposes a constitutionally suspect burden.[13]

**12.** As plaintiffs point out, no other act or application during the pendency of deportation proceedings causes the imposition of a two-year bar. *See* Conclusions of Law No. 77, *infra.*

**13.** Section 5(b) would be analogous to a statute that adds an additional two-year prison term if a criminal defendant marries during trial. While the defendant's spouse could not contest the normal sentence on the ground of marital

41. Second, as a citizen Mrs. Manwani has a constitutional right to remain in the United States. *Escobar v. INS*, 896 F.2d at 569. *See, e.g., Cerrillo–Perez v. INS*, 809 F.2d 1419, 1423 (9th Cir.1987) ("[c]itizen children have, of course, an absolute right to remain in the United States"). *Cf. Shapiro v. Thompson*, 394 U.S. at 630–631, 89 S.Ct. at 1329; *Afroyim v. Rusk*, 387 U.S. 253, 263–65, 87 S.Ct. 1660, 1665–66, 18 L.Ed.2d 757 (1967). Yet, Section 5(b) forces Mrs. Manwani to choose between her right to marital association and her right to continue her residence in this country. *Id.* 896 F.2d at 569. *See Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).

42. Third, Mrs. Manwani has a protected property interest, codified in the INA, to petition the INS to obtain immediate relative status for a bona fide spouse.

■ 43. Citizens have a constitutionally protected statutory entitlement "to submit and substantiate their marriage." *Ali v. INS*, 661 F.Supp. at 1246 n. 6. This entitlement is derived from the INA's definition of "immediate relative" in section 201(b), 8 U.S.C. § 1151(b), and the related provision that mandates that the Attorney General "*shall* ... approve" a citizen's visa petition if "the facts stated in the petition are true and ... the alien in behalf of whom the petition is made is an immediate relative specified in Section 1151(b). ..." 8 U.S.C. § 1154(b) (emphasis added).[14] *See Ali v. INS*, 661 F.Supp. at 1246 n. 6 ("Immediate relative status is not a discretionary government entitlement. Once the INS determines that an alien is married to an American citizen ... it must grant immediate relative status"). *See Escobar v. INS*, 896 F.2d at 569.

44. Section 5(b) abridges this entitlement without first affording a proper hearing. The fact that the deprivation is accomplished through statutory means does not insulate it from constitutional review. The "categories of substance and procedure are distinct," and statutory procedures that modify statutory entitlements must satisfy constitutional standards. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. at 541, 105 S.Ct. at 1492. *Loudermill* specifically rejected the argument that " '[t]o require additional procedures would in effect expand the scope of the property interest itself.' " *Id.* at 540, 105 S.Ct. at 1492. " 'Property' cannot be defined by the procedures for its deprivation, any more than can life or liberty." *Id.* at 541, 105 S.Ct. at 1492.

> [T]he Due Process Clause provides that certain substantive rights—life, liberty, and property—cannot be deprived except pursuant to *constitutionally* adequate procedures.... "While the legislature may elect not to confer a property interest ... it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate safeguards."

*Id.* (citation omitted) (emphasis added).

45. The courts that have upheld Section 5(b) have failed to understand the import of *Loudermill* and have incorrectly analyzed the deprivation of property rights that Section 5(b) causes. These decisions have considered only the language of Section 5(b) itself instead of the entire statutory framework of which it is a part. *See, e.g., Anetekhai v. INS*, 876 F.2d at 1223; *Azizi v. Thornburgh*, 719 F.Supp. at 95; *Escobar v. INS*, 700 F.Supp. 609, 612 (D.D.C.1988) *rev'd* 896 F.2d 564 (D.C.Cir.1990); *Smith v. INS*, 684 F.Supp. at 1118.

association, any *additional* prison time that was imposed because the couple married while the trial was pending would constitute an unconstitutional interference with the right to marry.

In addition, the *Burrafato* line of cases is also inapposite because it does not involve claims based on procedural due process rights. *Escobar v. INS*, 896 F.2d at 569.

**14.** Notably, Section 5(b) amends neither of these provisions. The relevant portion, codified at 8 U.S.C. § 1154(h), states that "[n]otwithstanding subsection [1154](a)" a visa petition based on a marriage entered into during deportation proceedings may not be approved until the alien has resided outside the United States for two years. However, subsection (a) addresses only the *filing* of visa petitions, which subsection (h) does not prohibit. The mandatory approval procedure is set forth in § 1154(b), which Section 5(b) does not address.

46. Since the Immigration Act establishes that citizens are entitled to an approved visa petition for a bona fide spouse, that interest cannot be deprived "except pursuant to constitutionally adequate procedures." *Loudermill*, 470 U.S. at 541, 105 S.Ct. at 1492. The procedure imposed by Section 5(b) is manifestly deficient because it precludes a timely and meaningful hearing. Section 5(b), like the statute in *Loudermill*, impermissibly attempts to redefine the property interest (the approved visa petition) "by the procedures for its deprivation" (two years foreign residency) in violation of due process. *See Escobar v. INS*, 896 F.2d at 568.

2. Mr. Manwani.

■ 47. Section 5(b) also implicates constitutionally-protected interests of Mr. Manwani. Mr. Manwani's status as an alien subject to deportation proceedings does not diminish his entitlement to the protections of the Fifth Amendment. Aliens in the United States are protected by the Constitution, including specifically the Due Process Clause, regardless of their immigration status. "The Fifth Amendment ... protects every [alien within the jurisdiction of the United States] from deprivation of life, liberty, or property without due process of law.... Even one whose presence in this country is unlawful, involuntary, or transitory, is entitled to that constitutional protection." *Mathews v. Diaz*, 426 U.S. 67, 77, 96 S.Ct. 1883, 1890, 48 L.Ed.2d 478 (1976) (citations omitted). *See also Landon v. Plasencia*, 459 U.S. at 32–34, 103 S.Ct. at 329–30; *Kwong Hai Chew v. Colding*, 344 U.S. at 596–98, 73 S.Ct. at 477–78; *Wong Yang Sung v. McGrath*, 339 U.S. 33, 48–51, 70 S.Ct. 445, 453–54, 94 L.Ed. 616 (1950).

> [O]nce an alien lawfully enters and resides in this country he becomes invested with the rights guaranteed to all people within our borders. Such rights include those protected by the First and Fifth Amendments and by the due process clause of the Fourteenth Amendment. None of these provisions acknowledges any distinctions between citizens and resident aliens. They extend their inalienable privileges to all 'persons' and guard against any encroachment on those rights by federal or state authority.

*Kwong Hai Chew v. Colding*, 344 U.S. at 596 n. 5, 73 S.Ct. at 477 n. 5 (citation omitted).

48. The power of Congress in the realm of immigration does not vitiate the fundamental protections of the Constitution. *Landon v. Plasencia* emphasized that the government's "sovereign prerogative" over matters of immigration does not override an alien's due process rights. 459 U.S. at 34–35, 103 S.Ct. at 330. The fact that immigration is "largely within the control of the executive and the legislature" (*id.* at 34, 103 S.Ct. at 330) constitutes *a factor* to be balanced against the equally "weighty" interest of the alien not to lose "the right 'to stay and live and work in this land of freedom'.... [nor to lose] the right to rejoin her immediate family, a right that ranks high among the interests of the individual." *Id.* at 34, 103 S.Ct. at 330. *See also Almeida–Sanchez v. United States*, 413 U.S. 266, 272, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973) ("no Act of Congress [in the immigration context] can authorize a violation of the Constitution"); *Carlson v. Landon*, 342 U.S. 524, 537, 72 S.Ct. 525, 532–33, 96 L.Ed. 547 (1952) ("[t]he power to expel aliens ... is, of course, subject to judicial intervention under the 'paramount law of the Constitution' "); *Fong Yue Ting v. United States*, 149 U.S. 698, 711, 713, 13 S.Ct. 1016, 1021, 1022, 37 L.Ed. 905 (1893) (immigration power must be exercised "consistent[ly] with the Constitution" and the judiciary must intervene where "required by the paramount law of the Constitution"). *See generally INS v. Chadha*, 462 U.S. at 940–41, 103 S.Ct. at 2778–79 ("Congress has plenary authority in all cases in which it has substantive legislative jurisdiction ... so long as the exercise of that authority does not offend some other constitutional restriction"). *Cf. Communist Party v. Subversive Activities Control Bd.*, 367 U.S. 1, 96, 81 S.Ct. 1357, 1410, 6 L.Ed.2d 625 (1961) ("congressional power in this sphere [protection against foreign invasion], as in all spheres, is limited by the First Amendment").

auto

49. The government's assertions regarding judicial deference to immigration legislation are overstated and contrary to established precedent. Almost a century ago, the Supreme Court struck down a provision of the Immigration Act of 1892, Act of May 5, 1892, 27 Stat. 25, that imposed a summary one-year incarceration on Chinese aliens who had been found deportable. *Wong Wing v. United States, supra.* Shortly thereafter, the Court held that deportation procedures must meet the standards of due process. *Yamataya v. Fisher (The Japanese Immigrant Case), supra.* Recently—subsequent to *Fiallo v. Bell*—the Supreme Court reaffirmed that the due process rights of aliens must be measured against constitutional standards of due process, regardless of Congress' statutory provisions. *Landon v. Plasencia, supra.*

50. Whatever Congress' power may be over the admission of aliens who are *outside* the United States (i.e., those who are deemed "excludable"), it does not authorize depriving aliens *within* the United States of due process. *Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 212, 73 S.Ct. 625, 629, 97 L.Ed. 956 (1953).

> [A]liens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law.

*Id.* at 212, 73 S.Ct. at 629 (citations omitted).[15]

51. Thus, Mr. Manwani is constitutionally-entitled to procedures and provisions that comply with procedural due process before he is expelled from the United States. Insofar as Section 5(b) summarily deprives him of constitutional or statutory rights or of procedural safeguards his claim constitutes an additional basis for relief.[16]

D. *The Requirements of Due Process.*

■ 52. Due process requires that before the government abridges or burdens a constitutionally-protected right, a meaningful hearing must be afforded. *See, e.g., Board of Pardons v. Allen,* 482 U.S. 369, 373 & n. 3, 107 S.Ct. 2415, 2418 & n. 3, 96 L.Ed.2d 303 (1987); *Hewitt v. Helms,* 459 U.S. 460, 466, 103 S.Ct. 864, 868, 74 L.Ed.2d 675 (1983); *Mathews v. Eldridge,* 424 U.S. at 332, 96 S.Ct. at 901; *Board of Regents v. Roth,* 408 U.S. 564, 572, 92 S.Ct. 2701, 2706, 33 L.Ed.2d 548 (1972).

53. Due process "is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). But in every case there must be a hearing " 'at a *meaningful* time and in a *meaningful* manner.' " *Mathews v. Eldridge,* 424 U.S. at 333, 96 S.Ct. at 902 (citation omitted) (emphasis added). Section 5(b) deprives couples of the rights enumerated above without affording a timely and meaningful hearing on the validity of the marriage. *Ali v. INS,* 661 F.Supp. at 1246 & n. 6. *See*

---

**15.** The conclusion in *Mezei* that excludable aliens lack any constitutionally-protected rights (345 U.S. at 212, 73 S.Ct. at 629) remains exceedingly controversial. It is arguably inconsistent with the holding in *Plasencia,* seems flatly inconsistent with some earlier Supreme Court and circuit court decisions, *see, e.g., Wong Wing v. United States* (5th and 6th Amendments apply); *Russian Volunteer Fleet v. United States,* 282 U.S. 481, 51 S.Ct. 229, 75 L.Ed. 473 (1931) (Takings Clause applies); *United States v. Henry,* 604 F.2d 908 (5th Cir.1979) (*Miranda* warning applies), and has been subjected to scathing criticism by legal scholars. *See, e.g.,* Hart, *The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic,* 66 Harv.L.Rev. 1362, 1387–96 (1953); Martin, *Due Process and Membership in the National Community: Political Asylum and Beyond,* 44 U.Pitt.

L.Rev. 165, 173–80 (1983); Aleinikoff, *Aliens, Due Process and "Community Ties": A Response to Martin,* 44 U.Pitt.L.Rev. 237, 237–39, 258–60 (1983); Schuck, *The Transformation of Immigration Law,* 84 Col.L.Rev. 1, 20 (1984). *See also* Henkin, *The Constitution and United States Sovereignty: A Century of Chinese Exclusion and its Progeny,* 100 Harv.L.Rev. 853, 862–63 (1987); 2 K. Davis, *Administrative Law Treatise,* § 11:5 at 358 (1979) (2d ed.).

**16.** In this regard, it is worth noting that while Congress may set "conditions" on an alien's entry, it may not set terms that deprive aliens in the United States of procedural due process. *See Landon v. Plasencia; Yamataya v. Fisher; Wong Wing v. United States.*

generally Bell v. Burson, *402 U.S. 535, 541, 91 S.Ct. 1586, 1590, 29 L.Ed.2d 90 (1971).*[17]

54. To determine whether due process is met the court must apply the three-prong test set forth in *Mathews v. Eldridge,* 424 U.S. at 335, 96 S.Ct. at 903. *See Landon v. Plasencia,* 459 U.S. at 34, 103 S.Ct. at 330 (applying *Mathews v. Eldridge* test to immigration procedures). This requires weighing (1) the private interest affected by the government's actions, (2) the risk of erroneous deprivation from the government's chosen procedure and the value of additional or substitute procedures, and (3) the government's interest in using its own procedures, including the burden that additional procedural requirements would entail. *Accord Escobar v. INS,* 896 F.2d at 571.

55. This court is uniquely well-situated to address these three factors due to the factual record presented by plaintiffs. It is the first complete and thorough presentation (based on documents, deposition testimony and admissions) available to any court to consider the constitutionality of Section 5(b) and includes the government's acknowledgements regarding the implementation of Section 5(b) and its impact on valid marriages. Furthermore, the consequence to this couple, where all of the evidence available to the Court confirms the validity of the marriage (*see* Finding of Fact No. 4–10, 17–26), makes manifest the interests at stake for these plaintiffs. *See Escobar v. INS,* at 572.

### 1. The Private Interest.

56. As fully set forth above, the interests of plaintiffs affected by Section 5(b) could hardly be greater. For Mrs. Manwani the interests include "having her husband considered now for immediate relative status and in avoiding the harsh choice between living without him or living out-side the United States for two years." *Escobar v. INS,* at 571. For Mr. Manwani, the interests include his statutory and constitutional right to a timely and meaningful hearing on whether he qualifies for immediate relative status. In addition, both plaintiffs have a "weighty" interest in living together during the most formative and vulnerable years of their marriage. This interest in marital association, as well as the right " 'to stay and work in this land of freedom' " is "without question, a weighty" one. *Landon v. Plasencia,* 459 U.S. at 34, 103 S.Ct. at 330 (citation omitted).

57. The burden placed on the marital interest by Section 5(b) is especially great because the law singles out new marriages at their most crucial and vulnerable stage. A forced estrangement will precipitate enormous strains at any time, but at the beginning of a marriage, it may be fatal. *See* Conclusion of Law No. 6 (citing studies).

### 2. The Risk of Erroneous Deprivation.

58. The second *Mathews* factor, the risk of erroneous deprivation, is also very high. The INS' own flawed survey of marriage fraud as well as the effect of the law since its enactment demonstrates that Section 5(b) deprives primarily bona fide couples of the aforementioned interests. The "survey" asserts that approximately *one third* of marriages between aliens and citizens "involve suspect marital relationships." Finding of Fact No. 43–45. *See also* Exh. V, House Report at 6; Senate Report at 2; 1986 U.S.Code Cong & Admin.News 5978. Although this figure represents a wholly speculative and exaggerated estimate, *see* Findings of Fact 36–50; Exh. H, Robins Decl. at para. 12–16, it demonstrates that Section 5(b) will disrupt—perhaps de-

---

**17.** The Fifth Circuit in *Anetekhai v. INS* relied on the district court decision in *Escobar* when it concluded that Section 5(b) requires only that plaintiffs be afforded a hearing to determine whether Section 5(b) "was properly triggered...." *Anetekhai,* 876 F.2d at 1223. This approach would render the constitutional protection meaningless and is contrary to the principle of *Bell v. Burson, Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), and *Israel v. INS.* The analysis begs the constitutional question since it addresses only what the statute itself provides and ignores the constitutional right that is at stake. In any case, the foundation for *Anetekhai's* conclusion has been eviscerated by the D.C. Circuit's reversal of the district court decision on which *Anetekhai* relied.

stroy—more than twice as many valid marriages as it does "suspect" ones.

59. Since the statute provides for *no* exceptions, innumerable legitimate marriages will inevitably be swept within Section 5(b)'s indiscriminate reach. The statute takes no account of the innumerable valid marriages that occur after deportation proceedings have commenced. Exh. K. RFA I Nos. 29, 33. A couple may have dated or even lived together since before proceedings were initiated, or been engaged but decided to delay their marriage for religious, cultural or financial reasons. Findings of Fact No. 29–30; Exh. C, Bernsen Aff. at paras. 28, 29, 30; Exh. E, Crosland Aff. at para. 6. Like the Manwanis the couple may have an established home life, be raising a child and be, in every respect, a familial entity that our society—including our immigration laws—seeks to encourage and protect.

### 3. The Government's Interest.

60. Finally, the government's interest must be assessed. As *Escobar* noted, the governmental interest in deterring sham marriages is also weighty. Marriage fraud undermines the immigrant preference system and may cause the exploitation of unwitting American citizens. *Escobar v. INS,* at 571. Similarly, the government has an historical and continuing interest in family unification and in accurately discriminating between bona fide and sham relationships. Yet, the government has no legitimate interest in denying immigration benefits to eligible aliens who qualify as immediate relatives.

61. These general interests, however, do not address the government's particular interest, if any, in the specific procedures enacted by Section 5(b).

62. As the *Escobar* court found, and as is even more exhaustively demonstrated by the record in this case, Section 5(b) does not improve the INS' ability to detect, prevent or deter fraud. Indeed, the law actually renders marriage fraud more difficult to detect, and, therefore, the government's ability to detect fraud is reduced, not enhanced, by Section 5(b). *See* Findings of Fact No. 32–42, *supra. Escobar v. INS,* at 572 ("The two-year absence might in fact serve as an equalizer between legitimate and fraudulent marriages, because the time apart or abroad might strain or distort legitimate relationships but do little to undercut the ability of cynical operators to simulate marital *bona fides* ").[18] Therefore, the court finds that the government cannot show any substantial interest in the actual provisions of Section 5(b) at issue in this case.

63. The government contention that its interest in *deterring* marriage fraud justifies the imposition of Section 5(b)'s *per se* rule is unavailing. Even if Section 5(b) were effective at deterring fraud (which it is not), the interest in deterrence cannot eviscerate constitutional safeguards. Otherwise, any class of aliens alleged to have an incentive to engage in fraud could be subjected to any deprivation, no matter how heinous or arbitrary, on the ground that the threat of such privation will deter misconduct. The government's approach would permit Congress to deter marriage fraud by, for example, providing that citizens and aliens who marry during deportation proceedings could not bear children for two years, could not engage in sexual relations with their spouse for two years, could not obtain a deportation hearing before their expulsion, or could not be represented by counsel in any proceeding. The goal of deterrence does not permit abridging the constitutional requirements of due pro-

---

**18.** *Escobar* notes that the ability to circumvent Section 5(b) may diminish the interest at stake for the citizen spouse but emphasizes that the law does "much better at favoring those with knowledge of the law over those without such knowledge than it [does] ... at favoring legitimate marriages over fraudulent ones." *Escobar v. INS,* at 571 n. 10.

Significantly, whatever means of avoidance may exist for other couples, the impact on plaintiffs is unaffected since they are, under the terms of the statute, irrevocably subject to the two-year bar.

cess.[19]

64. Finally, the fiscal and administrative burden that would result from affording the procedure that plaintiffs and others who marry during deportation proceedings seek (i.e., a timely hearing) is negligible. *See* Findings of Fact No. 31; Exh. C, Bernsen Aff. at para. 30; Exh. D, Gordon Aff. at para. 11; Exh. E, Crosland Aff. at para. 7. Procedures, including interviews and investigations, are already in place for evaluating and adjudicating marriage petitions. *See Ali v. INS*, 661 F.Supp. at 1238. Plaintiffs are not seeking any new procedures; they seek "only a modification of the timing of existing procedures." *Escobar v. INS*, 896 F.2d at 572.

65. Section 5(b) deprives plaintiffs of a *timely* hearing. *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). A couple's overwhelming interest in avoiding two years of separation or exile outweighs any governmental interest in postponing the hearing. In contrast to the usual petition approval process, Section 5(b) denies citizens an opportunity to demonstrate the validity of their marriage *prior to* the termination of the citizen's right either to live with her husband or to remain in the United States. The "stakes are simply too high" to rely on a post-deprivation hearing. *Id.* at 266, 90 S.Ct. at 1019. *See also Mathews v. Eldridge*, 424 U.S. at 331, 96 S.Ct. at 900; *Board of Regents v. Roth*, 408 U.S. at 569–70, 92 S.Ct. at 2705; *Morrissey v. Brewer*, 408 U.S. at 487–88, 92 S.Ct. at 2603. *See Escobar v. INS*, 896 F.2d at 570. Thus, the court concludes that Section 5(b) fails the *Mathews v. Eldridge* test and violates due process. *Accord Escobar v. INS*, 896 F.2d at 573.

### E. *Irrebuttable Presumption.*

■ 66. Instead of affording a meaningful hearing, Section 5(b) imposes an irrebuttable presumption. The presumption is that every marriage entered into during deportation proceedings is fraudulent unless it survives a two-year separation or exile. The statute conclusively presumes, by legislative fiat, that all marriages entered into during deportation proceedings are fraudulent if they fail the two-year foreign residency "validity test." Any marriage that is destroyed is deemed invalid *ab initio*.

67. No similar presumption is imposed on any other marriages under the Immigration Act. In every other case, (including under the newly-enacted "conditional residence" provision of IMFA) marriages are judged based on the intent of the parties at the time of the marriage. *See Bark v. INS, supra*.

68. The prior decisions upholding Section 5(b) have misconstrued the nature of the presumption created by the statute. *See, e.g., Escobar v. INS*, 896 F.2d at 567; *Anetekhai v. INS*, 876 F.2d at 1223; *Azizi v. Thornburgh*, 719 F.Supp. at 95; *Smith v. INS*, 684 F.Supp. at 1118. Their analysis does not address the irrebuttable statutory presumption that a marriage that fails to survive intact for two years under the harsh constraints imposed by Section 5(b) is deemed to have been fraudulent from its inception and invalid for all immigration purposes.

69. In addition, the D.C.Circuit seemingly agreed with the lower court *Escobar* decision that irrebuttable presumptions are substantive rather than procedural. This characterization is at odds with the view of the majority of the Supreme Court. As *Escobar* itself noted, in *Michael H. v. Gerald D.*, 491 U.S. ——, ——, 109 S.Ct. 2333, 2349, 105 L.Ed. 91, 114 (1989), "five Supreme Court justices agreed that a conclusive presumption is *procedural*." 896 F.2d at 567 n. 5 (emphasis added). *See Michael H. v. Gerald D.*, 109 S.Ct. at 2349 (Brennan, J., dissenting).[20]

---

**19.** As noted below, the characterization of Section 5(b) as a fraud deterrent does not accurately describe the statute's effect. In fact, Section 5(b) deters *marriage* and, at best, incidentally reduces fraud. *See* Conclusion of Law No. 101. Such an approach is no more justifiable than,

for example, a statute punishing all speech in order to prevent obscene speech.

**20.** In *Michael H.* the presumption was upheld only because four justices found no protected liberty interest in the relationship between a putative father and his illegitimate child by an-

70. In addition, the Supreme Court has consistently held that irrebuttable presumptions that involve the exercise of fundamental rights violate due process. *Stanley v. Illinois,* 405 U.S. at 656, 92 S.Ct. at 1215; *Cleveland Bd. of Educ. v. LaFleur, supra. See also Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975).

71. Reliance by some courts on *Weinberger v. Salfi* to uphold Section 5(b)[21] is misplaced because the presumption at issue there did not burden the exercise of a fundamental right. *See* 422 U.S. at 785, 95 S.Ct. at 2476. *Salfi* affirmed that when interests enjoying "constitutionally protected status," *id.* at 772, 95 S.Ct. at 2470, are at stake, conclusive presumptions are impermissible.[22]

72. The Fourth Circuit, like other courts, recognizes the significance of whether a constitutional right is involved. In *United States v. Wall,* 670 F.2d 469 (4th Cir.1982), the court denied an irrebuttable presumption claim because "the challenged regulation does not infringe on the exercise of rights having constitutionally-protected status." *See also Turner v. Department of Employment Security,* 423 U.S. 44, 46, 96 S.Ct. 249, 250, 46 L.Ed.2d 181 (1975) (*per curiam*); *Franz v. United States,* 707 F.2d 582, 606 (D.C.Cir.1983); *Kirk v. Secretary of Health and Human Services,* 667 F.2d 524, 534 (6th Cir.1981), *cert. denied,* 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983); *Black United Fund of New Jersey v. Kean,* 593 F.Supp. 1567, 1577 (D.N.J.1984), *rev'd on other grounds,* 763 F.2d 156 (3rd Cir.1985).

73. Even if Section 5(b) did not abridge a fundamental right, the statute could not meet even the standard set forth in *Salfi.* The Court there approved the overbroad rule both because it would protect against "the possibility of an abuse which [Congress] legitimately desired to avoid" *and* because "the expense and other difficulties of individual determinations justified the inherent imprecision of a prophylactic rule." 422 U.S. at 777, 95 S.Ct. at 2472–73.[23]

74. No such justification exists for Section 5(b). Affording plaintiffs a timely hearing would merely require the INS to determine the validity of the marriage now instead of two years hence under the very procedures that are already in place. Timely individual determinations of the bona fides of marriages for couples who marry during deportation proceedings would require only a minimal degree of expense and effort. Finding of Fact No. 31; Exh. C, Bernsen Aff. at ¶ 30. *See Azizi v. Thornburgh,* 719 F.Supp. at 96.

75. Just like presumptions that all unmarried fathers are unfit parents (*Stanley*) or that all pregnant women are physically incapable of working beyond a certain point in their pregnancy (*LaFleur*), Section 5(b)'s conclusive presumption impermissibly encroaches upon plaintiffs' "freedom of personal choice in matters of marriage and family life." *LaFleur,* 414 U.S. at 639, 94 S.Ct. at 796. Even if the government's interest were "sufficiently potent to justify invasion of constitutionally protected familial rights, the government may not rely on

other man's wife (*id.* at ——, 109 S.Ct. at 2344, 105 L.Ed.2d at 108) and because one justice found that the father had in fact been "given a fair opportunity" to show paternity. *Id.* at ——, 109 S.Ct. at 2348, 105 L.Ed.2d at 114 (Stevens, J., concurring). Under Section 5(b) there is no doubt that both a constitutionally protected liberty interest—marriage and marital association—is at stake and that plaintiffs are completely deprived of any opportunity to demonstrate the validity of their marriage.

21. *See Almario v. Attorney General,* 872 F.2d at 152–53; *Blackwell v. Thornburgh,* slip op. at 19–20; *Azizi v. Thornburgh,* 719 F.Supp. at 95; *Smith v. INS,* 684 F.Supp. at 1119.

22. *Salfi* is further inapposite because the statute challenged there permitted a couple to satisfy a plethora of "alternative indicia" to show that there had been "the assumption of responsibilities normally associated with marriage." 422 U.S. at 781, 95 S.Ct. at 2474. Section 5(b) completely precludes any alternative indicia whereby bona fide couples can show that their marriage was not contracted for the purpose of evading any provision of the immigration laws.

23. *Salfi* stressed that the relief sought by the plaintiffs "would involve payments of $30 million" (*id.* at 781 n. 13, 95 S.Ct. at 2475 n. 13) and require "inquiries into the degree of likelihood of death [that] could become very complex indeed." *Id.* at 783 n. 15, 95 S.Ct. at 2476 n. 15.

an irrebuttable presumption that its interest would be promoted in a given case, without affording the affected parties an opportunity to prove otherwise." *Franz v. United States,* 707 F.2d at 606.

### F. *Equal Protection.*

#### 1. Heightened Scrutiny.

■■■ 76. Section 5(b) also violates equal protection. The statute discriminates among citizens by singling out those citizens who marry during the pendency of their immigration proceedings and prohibiting them from living with their spouses in the United States even if the marriage is bona fide.[24] Only couples who *marry* during proceedings are subject to the two-year bar and only marital petitions trigger the two-year requirement. Thus, Section 5(b) classifies based on the exercise of a fundamental right and must be subject to strict scrutiny.

77. The pendency of deportation proceedings does not prohibit the filing of any *non-marital* petitions or applications to obtain lawful status for an alien. Parents, children or siblings are not prohibited from filing relative petitions, 8 C.F.R. § 204.1, and employers are not forbidden from filing labor petitions. 8 C.F.R. § 214.2(h). Other applications such as for political asylum, 8 C.F.R. § 208.10, for suspension of deportation, 8 C.F.R. § 244.1, for voluntary departure, *id.,* and to reconsider previously-denied relief, 8 C.F.R. § 242.22, may all be filed during the pendency of proceedings. Only the marriage petition cannot be granted and only the act of marrying triggers the two-year exclusion.

■■■ 78. A classification that affects the exercise of fundamental rights must employ means that are narrowly tailored to accomplish a compelling governmental interest. When "a statutory classification significantly interferes with the exercise of a fundamental right, it cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests." *Za-*

*blocki v. Redhail,* 434 U.S. at 388, 98 S.Ct. at 682. The government's purpose, even if compelling, "cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Shelton v. Tucker,* 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960) (footnote omitted). *See also Plyler v. Doe,* 457 U.S. 202, 217 & n. 15, 102 S.Ct. 2382, 2395 & n. 15, 72 L.Ed.2d 786 (1982) (statute must be "precisely tailored to serve a compelling governmental interest" in order to survive strict scrutiny).

79. Section 5(b) is not drawn sufficiently narrowly to accomplish its purpose. By treating *all* marriages entered into during the pendency of deportation proceedings as suspect—instead of attempting to prevent or punish cases of actual fraud—the statute uses a scattergun approach that falls far short of the constitutional requirement of "narrow tailoring." A multitude of means less restrictive of constitutionally protected rights and more carefully focused on fraud are available.

80. For example, marriages entered into during the pendency of proceedings could be subjected to a higher standard of proof, *see* 8 U.S.C. § 1154(a)(2) (marriage petition may not be approved unless alien establishes by "clear and convincing evidence" that prior marriage was not fraudulent), to more probing scrutiny, *see* 8 U.S.C. § 1251(c) (fraud presumed unless alien establishes "to the satisfaction of the Attorney General that marriage was not contracted for the purpose of evading any provision of the immigrant laws"), or to a burden of explanation. *See* 8 C.F.R. § 208.11 (alien who does not timely apply for asylum "must reasonably explain the failure to request asylum prior to the completion of the exclusion or deportation proceeding").

81. As pointed out by former INS General Counsel Bernsen, the INS has had "many years of experience" in marriage investigations and "has developed very effective means for exposing fraudulent marriages" (Exh. C. Bernsen Aff. at ¶ 12), in-

---

**24.** Section 5(b)'s impact on citizens is evidenced by the fact that it is the *citizen's* petition that is denied when Section 5(b) is applicable. *See* 8 U.S.C. § 1154(a)(1).

cluding marriage interviews and, if necessary, subsequent investigation. These techniques, combined with more rigorous application and such additional criteria as those set forth above, would serve the government's goal through more narrowly-tailored means.

82. At a minimum, a discretionary waiver provision for couples, like the Manwanis, with valid marriages would make Section 5(b) a more narrowly-tailored statute. The absence of a waiver provision in Section 5(b) distinguishes it from every analogous provision of the Immigration Act [25] and further confirms the impermissible breadth of the statute.

83. In addition, new safeguards erected by other sections of IMFA are more carefully targeted at fraud. IMFA's "conditional residence" provision requires every alien who obtains lawful status based on a marriage that has been entered into within the previous 24 months to confirm the validity of that marriage after a two-year probationary period. *See* 8 U.S.C. § 1186a. Similarly, the newly-enhanced criminal penalties against citizens (and others) who participate in fraudulent marriages deters fraud without penalizing bona fide marital relationships. *See* 8 U.S.C. § 1325(b) (marriage fraud punishable by 5 years imprisonment and/or $250,000 fine). These provisions demonstrate Section 5(b)'s unnecessary overbreadth.

**2. Rational Basis Scrutiny.**

84. Even if Section 5(b) is subjected only to the minimal level of scrutiny applied in *Fiallo v. Bell,* and even if the law's impact on constitutionally-protected interests and procedural rights were absent

or entirely discounted, the statute is unconstitutional nonetheless because it is irrational.

85. Minimal rational basis scrutiny has increasingly resulted in the invalidation of legislation on equal protection grounds even in areas where courts are traditionally deferential to legislative decisionmaking. In *Williams v. Vermont,* 472 U.S. 14, 105 S.Ct. 2465, 86 L.Ed.2d 11 (1985), a Vermont tax was invalidated because:

> Under rational-basis scrutiny, legislative classifications are of course allowed some play in the joints. But the choice of a proxy criterion ... cannot be so casual as this, particularly when a more precise and direct classification is easily drawn.

*Id.* at 23 n. 8, 105 S.Ct. at 2472 n. 8.

86. The standard of review applied in *Williams* is evident in a number of recent decisions applying rational basis review to invalidate government action. *See, e.g., Hooper v. Bernalillo County Assessor,* 472 U.S. 612, 621–22, 105 S.Ct. 2862, 2867–68, 86 L.Ed.2d 487 (1985) (statutory distinction not rationally related to governmental purpose); *Zobel v. Williams,* 457 U.S. 55, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982) (distribution of revenues based on duration of residency violates minimum rationality test).[26]

87. The Fourth Circuit has recognized the emerging potency of rational basis scrutiny under the equal protection clause. *See Phan v. Commonwealth of Virginia,* 806 F.2d 516, 521 n. 6 (4th Cir.1986) ("we proceed from the modest proposition that simple articulation of a justification for a challenged classification does not conclude

**25.** *See* 8 U.S.C. § 1182(a)(16) & (17) (admission within one or five or ten years of expulsion permitted if "the Attorney General has consented to [the alien's] reapplying for admission"); 8 U.S.C. § 1182(e) (two-year residency requirement is waivable if the alien's departure "would impose exceptional hardship upon the alien's [citizen or lawfully resident alien] *spouse* or child....") (emphasis added).

**26.** A succinct discussion and summary of recent rational basis decisions appears in Note, *Justice Stevens' Equal Protection Jurisprudence,* 100 Harv.L.Rev. 1146, 1150–52 (1987). *See also* *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) (prison regulation restricting right to marry struck down as not reasonably related to purpose); *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (requirement of special use permit for home for the mentally retarded invalidated as irrational). *Cf. Plyler v. Doe,* 457 U.S. at 220, 102 S.Ct. at 2396 (denial of free public education to children of undocumented aliens held unconstitutional in part because irrational to punish children for transgressions of parents).

**1390**

the judicial inquiry"). *Accord United States v. Smith*, 812 F.2d 161, 169 (4th Cir.1987) (McMillan, J. addressing constitutional issue). *See also Moss v. Clark*, 698 F.Supp. 640, 650–52, 650 nn. 24 & 25 (E.D. Va.1988) (holding classification of prisoners irrational and reviewing recent Supreme Court cases).

88. In *Francis v. INS*, 532 F.2d 268 (2d Cir.1976), the Second Circuit applied rational basis scrutiny to an immigration classification in a context directly applicable to the instant case. *Francis* explained the applicable test:

> Under the minimal scrutiny test, which we consider applicable in this case, distinctions between different classes of persons "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation...."

532 F.2d at 272 (citation omitted).

89. Similarly, in *U.S. Dep't of Agriculture v. Moreno*, 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973), a federal food stamp eligibility statute designed to prevent fraud was invalidated because the law primarily affected not those intent on fraud but those legitimately entitled to food stamps.

> [I]n practical effect, the challenged classification simply does not operate so as rationally to further the prevention of fraud.

*Id.* at 537, 93 S.Ct. at 2827.

90. In *Francis v. INS, supra*, the Second Circuit reviewed the statutory provision that permitted aliens who were returning to the United States from a trip abroad to apply for a waiver of excludability while the same waiver was not available to identically-situated aliens who had never left. The court concluded that the statute was irrational because it gave greater rights to aliens who briefly left and returned than to aliens who never departed. *Id.* at 273.[27]

91. To survive rational basis review the government must do more than articulate reasons why the stated purpose of Section 5(b)—prevention, detection and deterrence of marriage fraud—is rational. The inquiry that is constitutionally required is whether Congress' *response*—as embodied in Section 5(b)—rationally furthers the congressional purpose.[28]

92. None of the prior courts have properly considered Section 5(b)'s operation in this light nor have any had the undisputed record developed in this court that proves the statute's irrationality. Plaintiffs have demonstrated the effect of Section 5(b) through extensive factual proof and the government has not disputed the accuracy of any essential element of plaintiffs' description. Based on the government's admissions in discovery and deposition testimony, on Plaintiffs' Statement of Material Facts to which the government offered no factual contradiction, and on the government's response to questions from the court at oral argument, the consequences of Section 5(b) are clear and undisputed. *See* Findings of Fact No. 27–42.

93. Section 5(b) distinguishes not between valid and sham marriages—or even between marriages based on the relative likelihood of fraud—but only between couples based on their ability to travel abroad.

27. The continuing vitality of *Francis* is confirmed by the acceptance of its holding in other circuits, its continued approval in the Second Circuit, and the INS' adoption of the decision throughout the country. *See Lok v. INS*, 681 F.2d 107, 108 n. 2 (2d Cir.1982). *See also Variamparambil v. INS*, 831 F.2d 1362, 1364 n. 1 (7th Cir.1987); *Gramaglia v. U.S.*, 766 F.2d 88, 91 (2d Cir.1985); *Newton v. INS*, 736 F.2d 336 (6th Cir.1984); *Chiravacharadhikul v. INS*, 645 F.2d 248 n. 1 (4th Cir.1981); *Tapia–Acuna v. INS*, 640 F.2d 223 (9th Cir.1981). *See generally Matter of Wadud*, Int.Dec. No. 2980 (BIA 1984); *Matter of Silva*, 16 I. & N. 26 (BIA 1976). *See Azizi v. Thornburgh*, 719 F.Supp. at 93.

28. Thus the statute must be justified by more than the conclusory assumption that it is not "illogical to assume that aliens ... in deportation proceedings are more likely ... to enter into fraudulent marriages...." *Almario v. Attorney General*, 872 F.2d at 152 (quoting *Smith v. INS*, 684 F.Supp. at 1117). Those statements beg the question. They address only whether Congress had a rational *purpose* for enacting Section 5(b), not whether the *means* imposed are rational.

Under the statute, the two-year exile applies to marriages entered into while administrative or judicial proceedings are "pending." A marriage entered into before, or after, the pendency of proceedings is not affected. Yet an alien needs to make only a brief physical departure from the United States to end the "pendency" of proceedings.[29] As a result, aliens in deportation proceedings who marry before they leave the country are subjected to the statute's penalty. But aliens who first leave and then marry are unaffected. The distinction actually drawn by Section 5(b) is between aliens who briefly depart the United States *before* they marry, and aliens who remain continuously in the United States *until* they marry. Finding of Fact No. 32–34.

94. This distinction bears no rational relationship to the validity of the marriage or the likelihood of fraud. The ability to travel abroad before marriage depends upon vagaries completely unrelated to marital legitimacy.

95. Furthermore, the distinction created by Section 5(b) mirrors the irrationality in *Francis*: aliens who briefly depart are eligible for continued residence in the United States while aliens who have been here continuously are subjected to a nonwaivable bar. 532 F.2d at 273.

96. In addition, Section 5(b)'s two-year exile irrationally creates unjustified pressures and burdens that will themselves threaten the demise of many bona fide marriages. A marriage that is indisputably legitimate at the time of celebration can be destroyed if the couple is forced to live apart or if the citizen spouse is compelled to abandon his or her country as a condition of maintaining her marital association. *See* Finding of Fact No. 36. Yet a sham relationship, where emotional and other ties are absent, will not suffer at all

under Section 5(b). Section 5(b) virtually insures that the only marriages likely to survive this "Orwellian ... test" (*Azizi v. Thornburgh*, 719 F.Supp. at 89) are those that are fraudulent. Thus, the statute precipitates consequences—the destruction of valid marriages—in which the government has no valid interest.

97. Yet it renders the government's legitimate interest—detection of marriage fraud—less achievable and makes marriage fraud *more* difficult to detect. Aliens who avoid the two-year rule by traveling abroad, as well as aliens who are subjected to the two-year exile period, will be better able to conceal a fraudulent relationship because the validity of their marriages will typically be adjudicated while they are outside the United States. Such review is less probing and less reliable than if the alien remained in the United States and were subject to traditional interrogation and investigation. Finding of Fact No. 37–40. *See Escobar v. INS*, 896 F.2d at 572.

98. In addition, the only evaluation of many marriages will occur after a couple has resided apart for two years. Thus, the usual indicia of a valid marriage are not likely to be present and the problems of differentiating between bona fide and fraudulent marriages will be enormously exacerbated. *Escobar v. INS*, at 572.

99. Section 5(b) also eviscerates the "conditional" residence provision of 8 U.S.C. § 1186a. Since a couple subjected to Section 5(b) will necessarily have been married more than two years by the time their visa petition is filed, the conditional residency and second interview procedure will never be applicable. 8 U.S.C. § 1186a(g). Finding of Fact No. 40.

100. Finally, Section 5(b) is so grossly and indiscriminately overbroad that it exceeds the bounds of rational decisionmaking. At most *a third* of the persons within

---

**29.** In *Matter of Enriquez,* Int.Dec. No. 3045 (BIA 1988), the Board of Immigration Appeals ("BIA") specifically addressed when proceedings are "pending" for purposes of Section 5. It held that "deportation 'proceedings' ... were still pending ... because the proceedings had not been processed to a final conclusion at that point *by the respondent's departure.*" Slip op. at 4 (emphasis added). The IMFA regulations likewise provide: "The period during which an alien is in such proceedings ... terminates *when the alien departs from the United States* while an order of deportation [or voluntary departure] is outstanding...." 53 Fed.Reg. 30,-011, 30,016 (August 10, 1988) *codified at* 8 C.F.R. § 204.1(a)(2)(C)(iii) (emphasis added).

Section 5(b)'s legislative classification actually possess the trait that Congress has a legitimate interest in reaching. Even that estimate is exaggerated and unreliable since it reflects only *suspicion* of fraud, not actual determinations. Finding of Fact No. 45–50. The government has not rebutted plaintiffs' showing that the overwhelming majority of couples who suffer the consequences of Section 5(b) are persons whom Congress has no legitimate interest in penalizing and who are entitled to permanent resident status.

101. The justification for Section 5(b) offered by the government and by the prior decisions is that the statute distinguishes based on the different incentive for fraud between aliens subject to proceedings and others. But the statute's effect on the purported incentive or likelihood of fraud is illusory. Section 5(b) deters only *marriage;* it does nothing to deter *fraud.* Even if aliens in deportation proceedings are deemed to have a greater incentive to engage in fraud, Section 5(b) only delays the marriage. It does not diminish, prevent or deter the opportunity or incentive for fraud. The classification created by Section 5(b) turns solely on whether an alien briefly departs the country and thus bears no rational relation to preventing or deterring fraudulent marriages.[30]

102. In summary, as a result of Section 5(b), the government is *worse off* in its ability to distinguish between fraudulent and bona fide marriages and to deter sham marriages. Unlike instances where a statute may go only part way toward addressing a perceived ill, Section 5(b) has left this country more vulnerable to marriage fraud than it was before 1986. Yet bona fide couples who are caught in Section 5(b)'s overreaching grasp suffer enormous hard-

ship. Accordingly, the court concludes that Section 5(b) violates even the most minimal level of rational basis review and deprives plaintiffs of the equal protection of the laws.

## CONCLUSION

For all of the foregoing reasons, the court holds that Section 5(b) violates the Due Process and Equal Protection requirements of the Fifth Amendment.

---

**30.** Likewise, the concern with problems of proof mentioned by the Supreme Court in *Fiallo* bears only a superficial similarity to this case. In *Fiallo* the rationale underlying the distinction in the statute was the difficulty in determining paternity in relation to determining maternity.

The distinction created by Section 5(b) does not rest on any similar rationale since it distinguishes among different persons without regard to the relative difficulty of *detecting* fraud. Regardless of whether a marriage occurs before or

during deportation proceedings, the "problems of proof" are identical. Unlike parentage of illegitimate children, where paternity is always more difficult to assess than maternity, the question of marital validity is the same regardless of when the marriage occurs. Thus, while the statutory definition upheld in *Fiallo* mirrored the relative difficulty of proof, Section 5(b) falls on couples whose marital validity is no more difficult to determine than that of other couples.